JACOB SCHIEBERL et al. v. HENRY J. SCHIEBERL, Appellant.

**In Banc, November 17, 1914.**

1. **WILL CONTEST: Aged Testator: Unequal Distribution: Undue Influence: Testamentary Capacity: Evidence.** Testator when about 81 years old journeyed from his home at Cole Camp to Marshall, Missouri, where he spent several months with his son Henry. While there, having gone with Henry to a lawyer's office, he made a will by which he devised his real estate, worth about $15,000, to that son, and gave to his six

Schieberl v. Schieberl.

other children respectively $100, $500, $100, $200, $15, and $1000. He then returned to live until his death with his daughter at Cole Camp. In a contest of the will there was evidence, though it was by no means uncontradicted, that for two years before the will was written the testator had, on account of mental incapacity, ceased to attend to his business; and while the attesting witnesses testified that they considered him of sound mind, neither of them had had any acquaintance with him prior to the making of the will. *Held,* that the questions of testamentary capacity and undue influence were for the jury.

2. ———: ———: ———: **Erroneous Instruction.** An instruction in a will contest which told the jury that if they found the provisions of the will to be grossly unequal and discriminatory, then such inequality and discrimination, if not explained or accounted for, might be considered as tending to show want of capacity to make a valid will, but for that purpose only, ,was reversible error in that it failed to include other circumstances tending to show mental incapacity. Gross inequality in the distribution of an estate is a circumstance which, when coupled with other circumstances, may tend to show mental incapacity, but standing alone it has no such tendency. [WOODSON and GRAVES, JJ., dissent on the ground that the evidence so conclusively showed mental incapacity that the proponent was not harmed by the instruction.]

3. ———: ———: **Old Age and Infirmity as Evidence of Mental Incapacity: Instruction.** In a will contest an instruction which told the jury that old age, sickness, bodily disease, and infirmities alone furnished no evidence of mental incapacity, and that unless they found testator's mind to have been so unsound that he could not understand the act he was performing, the property he possessed, the disposition he was making of it, and the objects of his bounty, they could not find against the will on the ground of mental incapacity, was rightly refused. Evidence of old age, sickness, bodily disease, and infirmities are all matters to be considered by the jury in determining mental capacity.

4. ———: **Subscribing Witness: Evidence of Facts Upon Which He Bases Opinion of Testator's Capacity.** *Semble* that in a will contest a subscribing witness should be permitted to state on what facts his opinion as to the testator's mental capacity is based.

Appeal from Benton Circuit Court.—*Hon. C. A. Denton,* Judge.

REVERSED AND REMANDED.

*Alf F. Rector* and *Henry P. Lay* for appellant.

(1) There being no substantial evidence of lack of testamentary capacity, it was the duty of the trial court to direct a verdict for the defendant, and having failed to do so, this court will review all the testimony, and finding no such evidence will reverse the case and remand with directions to enter a judgment sustaining the will. It appearing that the testator had mind enough to understand that he was making his will and knew the natural objects of his bounty, the extent of his property, and the disposition he was making of it, his will must be upheld. Neither evidence of old age, feebleness and eccentricities, nor the opinions of nonexpert witnesses not based on facts which show mental incapacity, will justify the submission of the case to the jury. Winn v. Grier, 217 Mo. 420; Hamon v. Hamon, 180 Mo. 685; Cash v. Lust, 142 Mo. 630; Sayre v. Princeton, 192 Mo. 95; Gibony v. Foster, 230 Mo. 106; Weston v. Hanson, 212 Mo. 248; Southworth v. Southworth, 173 Mo. 59. (2) Instruction 4, given on the part of plaintiff over the objection of the defendants, is erroneous and improper and highly prejudicial to the defendant. In 1 Underhill on Wills, p. 147, it is said: ''It is therefore reversible error for the court to single out an unequal distribution from all facts in evidence and give a special instruction as to the effect that would have in determining that the testator was insane.'' Bledsoe v. Bledsoe, 1 S. W. 10; Zemlech v. Zemlech, 90 Ky. 655; Mattox v. Mattox, 114 Mo. 49. There is no evidence whatever of any confidential or fiduciary relations between testator and defendant Henry J. Schieberl so as to cast upon him the burden of explaining why his father had given him a larger part of his property than that given the other members of the family. McFadin v.

Catron, 120 Mo. 274; Hughes v. Rader, 183 Mo. 712-13. This instruction is particularly vicious by reason of the fact that the court by instruction 5 given for the plaintiff includes the reasonableness or unreasonableness of the will as a fact for the consideration of the jury. It will be readily seen that the undue prominence given by the trial court to the unequal distribution among the testator's children must have been highly prejudicial to the defendant, it being well known that juries are too prone to attempt to correct real or fancied inequalities in wills, thus substituting their necessarily limited knowledge of the relationship and condition of the parties for the full knowledge of and the wishes of the testator. (3) It was error to refuse to permit attesting witness Hiram Ferril to give his opinion as to whether testator at the time of the execution of the will knew what property he had and how he was disposing of it in his will. This was denied because the witness had not given the facts on which he based the opinion, which is not necessary or required in the case of attesting witnesses. While it is true this witness was at first permitted to state that he considered testator of sound mind, afterwards the action of the court in the presence of the jury, practically destroyed the value of the testimony of this subscribing witness, which was reversible error. 1 Underhill on Wills, p. 107, and sec. 102. In 40 Cyc. 1035, it is stated: "It is a well-settled rule that a subscribing witness to a will may testify as to his opinion formed at the time of the execution of the will, of the mental capacity of the testator without stating the facts or grounds upon which the opinion is based, and the testimony of such a witness is entitled to considerable weight." Citing Southworth v. Southworth, 173 Mo. 59. The trial court proceeded on the theory that an attesting witness was only competent to give his opinion of the capacity of testator after he had given the facts upon which the opinion was based. This is not

the rule.    (4) Instruction 1-½-D, asked by the defendant and refused by the court, should have been given. McFadin v. Catron, 138 Mo. 217; Crouch v. Gentry, 113 Mo. 248.

*George F. Longan, T. C. Owen* and *W. S. Jackson* for respondents.

Witnesses who bear close family, social or business relations with testator possess the most favorable opportunities for knowing his mental conditions, and usually their testimony as to his mental capacity is entitled to great weight.   Holton v. Cochran, 208 Mo. 314; Knapp v. Trust Co., 199 Mo. 640.   Gross inequality in the dispositions of the instrument when no reason for it is suggested, either in the will or otherwise, may change the burden, and require explanation on the part of those who support the will, to induce the belief that it was a free and deliberate off-spring of a rational, self poised and clearly disposed mind.   Gay v. Gilliam, 92 Mo. 150; Harvey v. Sullen, 46 Mo. 147; Mowry v. Norman, 204 Mo. 173.   The provisions of the will itself  are competent evidence as to the testamentary capacity, and if there is unjust discrimination against those entitled to be provided for, it is a circumstance tending to show want of capacity.   Gay v. Gilliam, 92 Mo. 250; Roberts v. Bartlett, 190 Mo. 699; Young v. Ridenbaugh, 67 Mo. 586.   A will contest is an action at law, and this court will not pass upon the credibility of the witnesses and the weight of the evidence, if the evidence be substantial; these considerations are relegated to the triers of the facts. Naylor v. McRuer, 248 Mo. 458.   Where there is substantial evidence of testator's incapacity to make a will, the issue becomes one for the determination of the jury and not to be determined by a peremptory instruction.   Mowry v. Kettering, 204 Mo. 173; Naylor v. McRuer, 248 Mo. 458.   Instruction 4 given for plain-

Schieberl v. Schieberl.

tiffs and complained of at point 2 of appellant's brief,
was proper. The provisions of the will itself are com-
petent evidence, when grossly unequal and discrimina-
tory, as tending to show want of mental capacity, and
the burden being on the proponents all the way through
the case to show mental capacity, there could have
been no error in giving the instruction as framed, for
it was limited and circumscribed in its terms so that
in effect it did no more than tell the jury that they
might consider the terms of the will as tending to show
mental incapacity if its provisions were unexplained.
Meier v. Butcher, 197 Mo. 89. The rulings in the Mattox
case and other cases cited by appellant are not in
point in connection with this proposition. (a) Be-
cause the instructions referred to therein, are not iden-
tical in language, nor substantially so with the one
at issue. (b) Because upon the issue of undue influ-
ence (unless a confidential relation is shown to exist)
the burden is always on the contestants and in the
cases cited under this head by appellant the court was
dealing with the question of undue influence and not
with mental capacity. With regard to mental capacity
the burden continues upon the proponents of the will
throughout the case and in the present case the issue
of undue influence had been eliminated and taken from
the jury by instruction 7. Mowry v. Norman, 204 Mo
189. There was no error in refusing defendant's in-
struction 1½D because the law of the case from defend-
ant's point of view had been fully and correctly de-
clared in the other instructions given at plaintiff's
request, and the same proposition of law fully sub-
mitted in such instructions.

ROY, C.—This is a proceeding by Jacob Schieberl,
Mary Esser, Martin Schieberl, Joseph Schieberl and
Elizabeth Stohr, contesting the will of Jo-
han Schieberl on the ground of unsound-
ness of mind of the testator and of undue

Will
Contest.

influence. Henry J. Schieberl, John Schieberl, Wenzel Schieberl, John Schieberl, Jr., and the trustees of St. Peter's Roman Catholic Church of Cole Camp were made defendants. There was a verdict against the will. Henry J. Schieberl alone has appealed.

The will is as follows:

"The last will and testament of Johan Schieberl. Know all men by these presents that I, Johan Schieberl, of Benton county, in the State of Missouri, do make and publish this my last will and testament now revoking all former wills by me made.

"First, I will all my just debts be paid.

"Second, I will, give and devise to my son, Henry J. Schieberl of Saline county, Mo., the following described lands situated in the county of Benton in the State of Missouri to have and to hold in fee simple to him and his heirs and assigns forever, to-wit:

"The northwest quarter of section twenty-three (23) township forty-three (43) range twenty-two (22).

"The southeast quarter of the southwest quarter of section twenty-one (21), township forty-two (42), range twenty-one (21). The west half of the northwest quarter of section thirty-two (32), township forty-three (43), range twenty-one (21). The west half of the northeast quarter of section twenty-eight (28) township forty-three (43), range twenty-two (22), and the ten acre tract owned by me in the southwest quarter of the northwest quarter of section thirteen (13) township forty-two (42), range twenty-one (21); containing in the aggregate four hundred and ten acres.

"Third, I will and bequeath to my son, Jacob Schieberl, two hundred dollars.

"Fourth, I will and bequeath to my daughter Mary Esser, five hundred dollars.

"Fifth, I will and bequeath to my son John Schieberl, one hundred dollars.

"Sixth, I will and bequeath to my son Martin Schieberl two hundred dollars.

"Seventh, I will and bequeath to my son Joseph Schieberl the sum of fifteen ($15) dollars.

"Eighth, I will and bequeath to my daughter Elizabeth Stohr the sum of one thousand dollars.

"Ninth, I will, give and bequeath to St. Peter Roman Catholic Church at Cole Camp, Benton county, Missouri, the sum of one hundred dollars, to be paid to the treasurer of said church, said sum to be kept at interest, and the annual interest thereon to be used in keeping the property of said church in repair, and the principal to be used for the same purpose, or in rebuilding the church, when absolutely necessary. The rest and residue of my property, real and personal or mixed, I give and bequeath to my seven children heretofore named in this will share and share alike.

"Tenth, having heard nothing of my son John Scheiberl for about five years, if he has departed this life, it is my will that the sum of one hundred dollars given to my said son John, by the fifth item of this will to be paid to the two sons of John Schieberl, namely John and Wenzel, share and share alike, it is my will that the other children of said son John shall have no interest in my estate.

"I appoint my son Henry J. Schieberl, executor of this my last will and testament and request that no bond as such be required of him. Witness my hand this 13th day of August, 1908.

                        "JOHAN SCHIEBERL,"

The proponents offered formal proof of the will as follows:

Alf F. Rector, one of the attorneys for the defendants, testified: "I have practiced law since 1885. I wrote the will of Johan Schieberl; I had seen him before, but had no acquaintance with him. Mr. Ferrell and I witnessed it at his request. We saw him sign it, and he declared it to be his will. He had a deed and a tax receipt from which I got the description of the land. He gave me the names of all his children and

stated what he wanted to give to each one. Henry had no part in writing the will except to answer one or two questions that I asked him as to the spelling of some of the names. The old gentleman told me generally what he had. I saw no indication of any weakness in him. I considered him of sound mind. He said he wanted to give Henry his land, and said that his personal property would amount to two thousand or twenty-five hundred dollars, in notes and deposits. He said that John and Martin each owed him a note. He seemed to understand me perfectly well. Sometimes I would have to make him repeat. I read the will to him. Mr. Ferrell did not know the testator. They were there in the office some time together. Henry Schieberl had spoken to me that morning or the day before and made an appointment to write the will.''

Hiram Ferrell: ''I am seventy-three years old and live at Marshall. Have been county clerk and deputy and justice of the peace. I witnessed the will. It was read and explained to him by Mr. Rector who also witnessed it. I considered the testator of sound mind. I heard conversation between him and Rector.'' During his examination the following occurred:

''Q. State whether, from what was said by Schieberl, and his manner, conduct and appearance, you are of the opinion that his mental condition was such that he knew what property he had, and how he was disposing of it in said will?''

''By Judge Longan: Mr. Rector stated here that he wasn't there at the time the will was drawn; so he didn't hear anything.

''By the Court: I am inclined to think the objection is good.

''To which ruling the defendant then and there excepted and now excepts.''

''I don't think I had any acquaintance with John Schieberl before that day. The will had been prepared

when I got into Mr. Rector's office.  I don't know Henry Schieberl.''

The will and its attestation were then read in evidence.  The contestants offered the following evidence:

J. F. Howe, cashier of the bank of Ionia, testified: ''I knew Schieberl for twenty-five years; I wrote rent1 l contracts for Schieberl for ten years, did not mak( the contracts, but wrote them at Schieberl's request. He made time deposits and wanted interest on them, that was when he began to deposit in 1905; he was a pensioner and would deposit his pension and want interest on it.  He talked very fast and sometimes I would ask him to go slower.  For three years he was failing fast both in body and mind.  In the last three or four years, Mr. Stohr frequently came with him to the bank; in the last three years he had done but little business, if any, unassisted.  Mr. Stohr usually accompanied him to the bank when there was business to be done.  In May, 1908, when I last saw him, he did not have the intelligence necessary to transact his business alone.  One cold stormy day, when other people wore overcoats, he came in wearing slippers without socks and with just a little cape about his shoulders; when busy talking would not notice other people standing by.  He kept money in the bank on open account and on time deposit.  He or some one else would make the contracts for rent and I would put them in writing; would sometimes send the renter with Stohr and would sometimes come himself.  I never knew of him being beaten out of any money; he or somebody else preserved it.''

During cross-examination the following occurred:

''Q.  I am trying to find—I believe you stated a while ago, that your judgment was that he wasn't completely competent to attend to all his business transactions, without assistance, is that right?  A. That's right.

"Q. Now isn't it a fact almost every man needs some assistance in attending to all his business transactions; and needs somebody that understands drawing up contracts? A. A good many of us do, yes, sir.

"Q. Well; that is what you meant by that; wasn't it? A. Not exactly, Mr. Lay.

"Q. Well, what did you mean by it, Squire? A. Well, I meant that his understanding of business—that the education that he had—he had no education; that his understanding of business wasn't what it ought to be.

"Q. And that he needed someone to explain these matters to him? A. Yes, sir.

"Q. And draw his interest contracts? A. That is just what I meant to answer.

"Q. I thought that is what you meant; now you haven't any doubt but that at that time the old gentleman knew what property he had, had you—what land the note was on? A. That he owned a farm here and a farm there?

"Q. Yes. A. Oh, yes; he knew that.

"Q. He knew that? A. Knew he had a farm here and a farm there; and a piece of land there.

"Q. And also knew that he had money in your bank? A. Certainly; I don't know whether he knew how much or not; he knew he had money there.

"Q. He knew his children, didn't he; knew who they were? A. I think so, yes, sir.

"Q. And if he would give anything to anybody, he had mind enough to understand that he was giving them something—wouldn't he? A. Well, yes, he would understand that; he understood it, but—well, you haven't asked me."

On redirect examination the following:

"Q. What do you mean by business capacity, with reference to his mental condition? I am getting at—Squire Howe, do you mean to tell this jury, that this man was absolutely sound, and that you don't mean

to say anything else but that he had business capacity, but didn't have business qualifications? That is what Mr. Lay said you meant; I want to see whether you meant that or not.''

"By Mr. Rector: I object to that; he's cross-examining his own witness.

"By the Court: It looks a little that way; I believe I will let the answer go.

"A. I said I regarded—I answered that question, I am sure, further along—that I didn't regard his judgment—that he was enfeebled both in body and mind; I would not regard his judgment as sound upon business transactions; now, if they want it that plain, I will state it that way; that is getting around to just what I think I said in other words.''

On re-cross-examination the following:

"Q. You didn't mean, by that, however, to say, Squire, that you think that he didn't know, didn't realize what property he owned, did you? A. I told you that he knew that he had a farm over there, and he had a farm where he lived, and that he had a pasture down here, and had a piece of timber land over there.

"Q. He knew he had money in the bank? A. Yes, sir.

"Q. Well; that was about all the property he had, wasn't it? A. That's all I know of.

"Q. And he knew of all that property, didn't he? A. I told you I think he did. Yes, sir.

"Q. And also knew his children, who they were; you have no doubt of that, have you; I believe you answered that question before? A. I think so too; I think I answered it.

"Q. Well, Judge Longan has gone after it all again; I want to make this proposition clear; you do think that he realized what children he had; what heirs? A. That he knew all his children?

"Q. Yes. A. Why, certainly, I do.

"Q. And that if he was drawing a will, leaving his property to those children; you believe that he had sufficient mind to understand that he was making such a will? A. Yes, sir.

"Q. And he did transact various business matters, and, so far as you know, never lost any money by so doing? A. No, not as far as I know.

"By Judge Longan: Do you mean to have the witness say he transacted various business matters in the last year or two?

"By Mr. Lay: Yes, sir.

"By Judge Longan: Better let the witness understand it that way.

"Q. He did transact various business matters with you in the last years of his life? A. I repeatedly said, Mr. Lay, in the last three or four years of his life—three years—Mr. Stohr came with him, when there was any important business to be done.

"Q. Do you mean to say that Mr. Stohr always came with him? A. Unless he came to make a pension voucher, he usually brought him; I say sometimes the old gentleman came—one time I related to you when he came improperly clad; he came alone that day.

"Q. And another time he walked, when you thought he ought not to? A. Yes, I say; but usually, in the last years of his life, Mr. Stohr came with him; and at times when someone was to settle with him, or their paper was to be renewed, or something, Mr. Stohr would then bring that, and say grandpa wants so and so done.

"Q. Now when he came up there to make a deposit with you, he wouldn't ask Stohr's advice about making it, would he? A. Do you want me to tell the whole thing, the whole of it?

"Q. I am asking you that question? A. Mr. Stohr and Schieberl would come in together; Schieberl would walk up to the window, and Stohr would come in at his side.

"Q.   Walk up to your window?  A.  Yes, sir.

"Q.   And Schieberl would tell you what he wanted done?  A.  Well, I don't know whether he told me, or whether anything was said; he would take out his paper, and I knew he wanted cash for it.

"Q.   Well, you didn't hear him, under those circumstances, asking Stohr what he ought to do with it?  A.  No.  Stohr would sometimes say what the old gentleman wanted."

On redirect examination the following:

"Q.   I will ask you this question, Mr. Howe: Based upon all the facts that you have testified to, with reference to Mr. Johan Schieberl, and his condition in May, 1908, and for a year preceding that month, and up until the last time you saw him, I will ask you if, in your opinion, he was, without the aid of any other person, strong enough in mind to comprehend all of his property, and all the persons who naturally came within the range of his bounty; or if he had sufficient intelligence to understand his ordinary business, or to know what disposition he would be making of his property, without the assistance of some one else, if he was making a will at that time?

"A.   I have answered the question to my understanding.

"By the Court:  Mr. Howe, just please answer the questions as they propound them, and they will take care of it.

"A.   Well, I do, Judge; I have answered the question; I have to understand the question; I understood it to be the same that I answered no.

"Q.   And you answer this no?  A.  I do, yes, sir."

Re-cross-examination as follows:

"Q.   Now, by answering that no; you don't intend to tell the jury that he didn't have any of those faculties, do you?  A.  I meant he didn't have all of them; that is the way the question is.

"Q. By that you simply mean, as you explained to the jury before, that you think, by reason of his lack of business capacity, and lack of education, that he wasn't fully qualified to transact his business, without assistance? A. Business capacity, and education, and judgment.

"Q. By reason of the lack of that? A. I mean just what the English language expresses in that question.

"Q. That he wasn't fully capable of transacting his business, without assistance? A. Yes, sir.

"Q. But as to the rest of the question you don't answer no? A. I have to answer that question, the question was entire; I can't answer part of it, because Judge said I had to say yes or no."

Louis Schnabel, a merchant of Ionia, testified: "I knew Schieberl twenty or thirty years. Ten years before his death he was strong in mind and body; last two or three years he declined mentally and physically. He didn't do much business with me while he stopped with Mr. Stohr; of course they frequently bought his clothes, something to eat. He didn't seem to be at himself at times and would say things in presence of ladies which were not fit to be spoken in their presence. That was in the last two or three years. He didn't seem to lack intelligence at all; did not make such breaks until the last two or three years. His mental condition was weakened so that he didn't comprehend what he was saying."

Jerry Gallivan testified:

"I live at Martin Stohr's, have been there about four years; knew Johan Schieberl about twenty years. He was in the shop at Cole Camp when I first knew him and was a pretty stout, robust man, weighing about 185 or 190 pounds; the last two years he became very weak, weighing about 115 or 116 pounds. I was a farm hand. He would cut off limbs of trees and hedges and put in the creek; that wasn't benefiting the

place any that I could see, but was tormenting other people. The first flood that came would wash it down against the other man. He did that pretty much all the summer time, kept it up from the time I first went there until after he came back from Marshall. I once saw him running around there on the creek without breeches or drawers on and with no shoes. He would gather up nails and strings and rocks and have them in his pocket. Mrs. Stohr would wash his clothes and throw those things away and he would put more stuff back in his pocket. When he was about the kitchen he was right in the way all the time, wouldn't move for anybody; would look in every vessel on the stove, staid in the kitchen pretty near all the time. I would go through the motions, go lifting off lids, and would say: 'Lizzie, what have you got in here?' and she would say: 'Go away from here; keep your nose out of my pots;' do that for his benefit; go to scolding me; I would go over the same performance.

"Q. Why did you go over the same performance? A. To get him to quit it. Q. So that she could reprimand him? A. Yes, sir. Q. What would he say about it? A. Never opened his mouth about it. Q. Would he quit? A. He would quit for that time; be the same thing over again in the next day or two. Mrs. Stohr would say nothing to him about it. He would clean his pipe and put it on the back part of the stove to dry. He would get a fruit can with red pepper in it; had quite a nice perfume there all the time. He put nicotine on the stove, tried to make snuff of it, drank red pepper tea, piping hot. The lady would never say anything to him about it. He would lie on the bed with his shoes on, with mud and manure on them. When Mrs. Stohr would gargle her throat with hot salt water, he would fix some the same way and drink it. When I first went there he would wake up during the night and pray so loud that he would wake

261Mo46

everybody up. About two years before he died he quit praying and quit reading his Gospel, as he called it. He was nervous when a storm came up and kept the little child with him until the storm was over. He treated the child well and she followed him around, and many times buttoned his breeches for him. She was eight years old. He exposed his person in the presence of the child and of anybody who would happen to be around. His mind was not extra good, he would forget where he would leave things and accuse the children of misplacing them; raised Cain there one day because he could not find his drawing knife. He depended on others, was not able to take care of himself; said he did not have any blood in his heart. He was very childish towards the last; I could not say that he was insane, but he was forgetful about things. He had only one eye. I never saw him under the influence of liquor over three times, then he was pretty noisy. I don't think he was competent to attend to his ordinary business affairs; he would have Mr. Stohr attend to his business for him. Nobody ever went there to rent a farm but Mr. Stohr had his say about it. He would call him in, didn't make any difference what he was doing. When he got to Ionia, coming from Marshall, Mr. Stohr quit his work and brought him home and the old gentleman went to. bed and staid there until about five o'clock in the evening. He was getting worse all the time; towards the last it got so he didn't do anything but sit in a stupor. Three or four years ago they performed an operation on him, on his back, or tail bone, you might call it. The doctor put his finger up there and could not touch bottom, corruption run out of it. Mr. Stohr had to attend to him. He went down hill after that, never was the same man, mentally or physically. We treated him just like we would a child. He would never get out of the way; it didn't make any difference what you were carrying, he wouldn't move. He would go to the

creek bank with his pockets full of dust, chaff, and feed, and scatter it on the creek bank. I never heard any trouble between him and Mrs. Stohr. He seemed to be fonder of her than any of the other children and was very fond of the youngest child.''

Wm. D. Brunjes testified: ''I am a lawyer and interested in farming. I knew Schieberl ever since I was a small boy. He was at first a strong man. Saw him about two years before his death. He didn't look to be anything like the height he had been when he was in his prime; he was decrepit in every sense of the term; fallen face, fallen cheeks, practically didn't seem any mind there at all; practically no life, decrepit as one could almost picture any old man. His mind went down with his body, in about the same comparison. He had no mind, wholly incompetent; he dissipated a great deal. It was very hard to grasp what he would say; his language was a conglomeration, just a wave and roll of words; he could not understand English as well as German.''

C. O. Howe, assistant cashier of the bank of Ionia, testified: ''Knew Schieberl since 1905. He became weaker mentally and physically ever since I knew him. When he came to the bank ordinarily he would know me, but on the street he didn't recognize me from any of the other boys; that was the last two years. At first I could not understand him and would have to talk to him as much by gesture as by speech. He would repeat things in the same conversation. I have known him to just stand and keep looking at me and I would get tired of explaining it over and over and he would finally go on and not give me any sign of recognition at all. The past year he wouldn't attempt to talk to any one, hardly my father. He never went through his accounts to see how we stood. After that operation he laid very low and never did recover. He had just recovered from a hard spell of sickness when he went to Marshall. At that time he was going down

very fast. I hardly ever saw him in conversation with others, as the bank is not the place for loafers. He came to the bank very often with his clothes unbuttoned and lightly clad. He came once in cold weather with house shoes and no socks. He was not capable mentally to comprehend the value or extent of his property, the names and number of his children and the objects of his bounty. He was not capable of transacting business at all, because we did all of his business for him. There were times when I didn't think he would know who his children were; there were times probably when he did. He would forget business that we transacted and went over for him time and again, he would forget entirely about that, sometimes before he would leave the bank.''

Everett Golden testified: "Jacob Schmelier, Sam Golden, and I were the nearest neighbors to Mr. Schieberl; have known him thirty-five years. I never could understand him very well. Four or five years ago I spoke to him about renting some land. He said I would have to see Martin Stohr about it. In June, 1908, he was getting older and weaker and feebler and declined more rapidly after the operation.''

Sam Golden testified: "I have lived near Schieberl twenty-five years. He lived with Martin Stohr, who attended to the business all the time, as far as I know. In June, 1908, Schieberl was going down all the time in both body and mind. He was not mentally competent to transact ordinary business by himself. He didn't act like a man, seemed like a child, like he didn't know anything. He always had somebody with him when he went past my place.''

Martin Schieberl, son of testator, testified: "When father was forty years old he weighed 190 pounds and was the strongest man in Cole Camp. He was going on eighty-two years old when he died. He got drunk a good deal and was very quarrelsome when he was drunk; he raised a great deal of disturbance among his

family and caused hard feelings. He had a good family of children and he had a good woman also. Father and Henry had a falling out. Father wanted to hire him, offered him $18 a month. He told my father he would not work on the farm for any s——of-a-b— for any $18 a month. He went to Sedalia; he didn't get to see father very often, about once in three or four years. Father went to see him twice in the last ten years. The last three years father was weak in mind and body. About six years ago he owed brother Jacob about $600 and paid it. He quarreled with everybody when he was drunk. I am worth about $1500. Martin Stohr has 15 or 16 cattle and 7 or 8 horses. I paid father a note of $530 just a few days before his death; I paid it in currency at his home."

Jake Schieberl, son of the testator, testified: "I live in Sedalia; I saw father the last time he went to Marshall. When I went to supper he was at my house in bed. I said, 'Howdy, father.' He said something; I could not understand what he said; I asked him what was the matter with him; he never answered me; never said he was sick, and he laid down at the depot. That was when he went to Marshall; he didn't stop as he came back. He said he was going to Henry's, down at Marshall. I took him to the Katy depot and got a ticket for him to Boonville. He was weak minded, too weak to go any place. I work for the Babcock Lumber Company. My sister, Mrs. Esser, lives in Sedalia; she is a widow and has eight or nine children, she has no property. I was not at father's house after he died nor at that time. I went to see father when he had that operation. In 1908 I had $2000 worth of property I think."

Mrs. Esser testified: "I am fifty years old. My husband died a year ago last January. I have ten children living and no property. I saw father at my brother's in 1908 when he went to Marshall. I put my hand over his shoulder and he looked around and

didn't know me and asked my sister-in-law who that was; he wasn't able to talk. Brother Henry told me how the will was, and said, 'Don't cause any trouble. If you need any help, I will help you;' and as he left he gave me two dollars.''

Mrs. Martin Stohr, daughter of the testator, testified: ''The first six months I was married we lived with brother Jacob; then father got me a house and made his home with me until his death, the last three years. He had an operation performed and he kept going down gradually, was feeble in body and mind and very childish, put the dirt and grit out of his pipe on the stove and burned that and put it in a box; and he would make red pepper tea and drink that; would pick up old rags and shoe strings and put them in his pocket. Every week I would wash the overalls and burn those rags and the next time it would be the same thing. I would have to keep after him to change his clothes. He would go to bed with his shoes on and I would take them off of him when he was too weak to take them off. He saw me use hot salt water gargle, and he put hot water in a teacup with three teaspoonsful of salt and drank that every morning. He would stand around the stove and take the lid off of the vessels, made it very hard for me all the time; looked over my shoulder while I was sewing, half an hour at a time. I handled him just the same as if he was a baby. I would have to stay with him in the closet; he was too weak to help himself. He treated me fine, I never had a cross word from him. My children treated him as nice as anybody could expect, and my oldest girl, ten years old, shaved him. Sometimes he would act like he meant to harm the children whenever they misplaced things. He said there was no blood in his heart. When he came from Marshall, the train carried him through to Calhoun and they sent him back on the train. He was feeble and went to bed. We lived on 160 acres and a pasture of 80

Schieberl v. Schieberl.

acres; we paid $300 a year rent and he gave my husband $6 a month for board. We paid about what farms rent for around there." ·

John Duber testified: "I live five and a half miles from the Stohrs. Mr. Schieberl took dinner at my house on his way to Marshall; he ate some, but he vomited."

John Stoddard testified: "I knew Schieberl thirty-two years. Was intimately acquainted with him; often at my house; was around my shop frequently. He was at my house about two months before he died. He got feeble in body, but could converse sensibly. His mental condition was all right. He would talk about business and how it used to be in other days. He took an interest in my affairs and was glad I was going well. He came regularly to church every two weeks until two months before he died."

Henry Ficken testified: "I lived three-quarters of a mile from Schieberl. I knew him forty-one years. He would come to my place often, but of late years he got too feeble. I saw him in May before he died. I bought his rent corn and he would require me to pay the money to him. I never saw any indications that his mind was unsound. When we met in the last few years we talked little except to greet each other. He complained of getting old and feeble and about his heart."

Joseph Schmelier testified: "I saw Schieberl pretty often the last five years. We didn't have much conversation. I talked with him before he went to Marshall. He said he had only one child, and that was Henry and that he would give Henry all he had. He told me that three or four times. He had a good mind."

Stephen Schmelier testified: "I saw testator frequently in the last five years, and talked to him a little. He had good health. Before he went to Marshall in 1908, he said he only had one son, and that was Henry,

and that he would give Henry all he had. He had a good mind.''

Martin Medek testified: "'I knew Schieberl from the time I was a boy. He often came to my house. The last two or three years he was like the average man of his age. There is no smarter man of his age than he was. He talked well of Henry.''

George Schuber testified: "I saw Schieberl at church often and talked with him. There was nothing wrong with his mind. At church a month or two before he died he wanted me to buy the farm I live on.''

George R. Bellew testified: "I live on one of Schieberl's places. I moved on the farm in February, 1909. He never came on the place while I was there. I made the contract of rental with him. He seemed capable of looking after his own interests. He had me furnish some work and material and he paid me after I did the work.''

Margaret Smazel testified: "I have lived at Cole Camp thirty-three years and talked with Schieberl. His mind was all right.''

Martin Schieberl testified: "I have lived in Boonville since 1830. I am a brother of the testator. In 1908 when he went to Marshall, I fixed a suit that I made for him twenty years ago. I dyed it. I also made a $25 suit for him and he paid me. He staid perhaps six days. He went to see an old sawmill friend while with me. On his way back from Marshall he came to my shop carrying his satchel. I saw nothing wrong with his mind. Before that he was at my house on his way to Marshall. I watched him to see if there was anything wrong. I took him to Marshall not because he needed me, but because I wanted to see his son Henry.''

During his cross-examination the following occurred:

"Q. Did you talk to Henry about the will? A. Why, only asked him about the will.

"Q. Did Henry tell you his father had left him everything, himself? A. Why, I don't know, probably he did say so.

"Q. He said that he left him the farm, all the land? A. Why he—

"Q. Nearly everything? A. Why, he didn't say everything; he said he left him—now, how much was it?—he said he left him half the land, I think; I forget things like that.

"Q. You asked him how he came to do it; you asked him what made his father leave him all of it? A. Well, maybe I did; I don't know exactly.

"Q. Well, you did, didn't you? You and Henry talked about it; now did Henry tell you at that time that he dictated that will? A. No, sir; I never said that; he never said dictated; that isn't so.

"Q. What did he say? A. Oh, no.

"Q. What did he say, if he didn't say dictated? A. Yes, sir; I have noticed myself that people didn't seem to understand my brother; couldn't understand my brother and Henry didn't understand his papa; and so he made his lawyers, whoever it was that made the will, understand what his father meant.

"Q. That is what Henry told you; he said he interpreted? A. I don't know what he said; I suppose he did.

"Q. He said he interpreted for his father, the will; ain't that what he said? A. Well, not necessarily.

"Q. Well, what was it, now? Tell the jury what he did say about interpreting that will. A. Well, that is all I have to say.

"Q. I am asking you about what Henry told you, about interpreting the will. A. Well, he only said some words what—some words they couldn't exactly understand right well, that Henry would tell them what he means; but that was no interpretation."

E. G. Utz testified: "I live at Marshall and am a carriage maker. Henry Schieberl has been in my employ as a blacksmith for nearly eighteen years. Whenever his father came to see him, he (the father) would come to my shop. I met and talked with him the last time he was there in 1908. I didn't notice a thing wrong with him. Our principal talk was about the shop work. He would sometimes advise me how to do with the work."

Homer Hatton testified: "I am employed at the Saline carriage works in Marshall, the same place where Henry Schieberl works. I knew Henry's father. I saw and talked with him nearly every day at the shop when he was at Marshall in 1908. His mind was sound."

Dr. M. F. Chastain testified: "I have practiced medicine nearly fifty years. I was postmaster at Marshall in 1908. I met John Schieberl at Utz's shop in 1908 several times. We had considerable conversation. Once he had me go to Mr. Ferrell's office to fix up his pension papers. We talked about people I knew in Benton county. I regarded him as being mentally normal."

Henry Schieberl testified: "I have lived at Marshall eighteen years. I never called my father a s——of-a-b——. I never had any trouble with him. In eighteen years he visited me four times. In 1908 he came in June and staid until the middle of August. I didn't see anything wrong with his mind. I was present at Mr. Rector's office when the will was made, but not all the time. I didn't use any influence with him to get him to make the will. I didn't say a word about dictating the will. I went with my father to Mr. Rector's office. I had been there in the morning to make a date at father's request. He didn't know Rector. I am not worth more than $2000."

Wm. Schurman testified: "I have lived at Cole Camp over fifty years. I saw Schieberl on the street and at church the last five years. I didn't notice anything wrong with his mind."

The real estate owned by testator at the time of his death was worth about $15,000.

At the close of all the evidence the defendant asked a peremptory instruction to the jury to sustain the will, which was refused. There was no instruction withdrawing the question of undue influence, but, on the other hand, there was no instruction submitting that issue to the jury.

The court gave for the plaintiffs the following among other instructions:

"4. The jury are instructed that if they find that the provisions of the will are grossly unequal and discriminatory, in favor of Henry J. Schieberl, and that such inequality and discriminations have not been explained or accounted for by the proponents of the will or otherwise, then you are instructed that such inequality and discriminations may be considered by you, as tending to show want of capacity to make a valid will, but for that purpose only."

And refused the following among other instructions asked by defendant:

"1½d. The court instructs the jury that old age, sickness and bodily disease and infirmities, alone, furnish no evidence of mental incapacity of the testator; and unless you find from the evidence that the testator's mind was so unsound that he could not understand the act he was performing, the property he possessed, the disposition he was making of it, and the persons or objects of his bounty, you cannot find against the will, on the ground of mental incapacity."

I. Appellant says that the trial court should have given the peremptory instruction to find in favor of

Aged Testator: Unequal Distribution.

the will: That raises the question both as to testamentary capacity and as to undue influence. In this case those two questions are so intermingled and interdependent that we deem it best to consider them together.

We are cited to a long list of cases in which it was held that there was no satisfactory and substantial testimony tending to show testamentary incapacity. At the head of that list, as cited, is Winn v. Grier, 217 Mo. 420. In that case, old age, disease, peculiarities, eccentricities, absent-mindedness, forgetfulness, and the opinions of witnesses that his mind was unsound,

Testamentary Capacity.

were relied upon to impeach the will. It was held that all those were insufficient to take the case to the jury. But there were two facts in that case which make a wide gulf between it and the case in hand: First, the evidence for the plaintiffs in that case showed that *the testator continued to transact his business in the usual way* until long after the will was written; second, the testator, so far as the evidence showed, dictated his will independently of any one, and had it witnessed by men one of whom had long known him in business, and both witnesses clearly testified as to his mental capacity, and that will showed that the testator had the business "fully in hand" (l. c. 456).

Ordinarily it is vain to say that a man is not mentally capable of attending to his usual business when he is, at that very time, engaged in doing his usual business in the ordinary way with reasonable success. So it will not ordinarily avail to say that a testator did not have testamentary capacity when the undisputed evidence shows that, unassisted and independently so far as declaring his purpose is concerned, he made a will which measured up to the character of "a rational act rationally done."

In all cases cited by appellant as above stated one or both the above propositions have been the bulwarks

behind which the will has stood secure. It may be conceded that those propositions are not always and alone the determining factors in a will contest. But ordinarily they are the pivotal facts which determine whether the will should stand. On the other hand, when there is substantial evidence showing that, on account of mental failure, the testator had ceased attending to his business, then the question of mental capacity must go to the jury. Likewise, when there is substantial evidence showing that the testator did not act independently in making the will, but that his will was controlled by the overpowering will of another, or that the will as made was not a rational act, then there is an issue for the jury to try.

We will not rehearse the evidence in this case, but there is substantial evidence showing that for the last three years of his life, and for two years before the will was written, the testator had, on account of mental incapacity, ceased to attend to his business. There is evidence to the contrary, but that question must be settled by the proper triers of the facts. Neither of the subscribing witnesses had any acquaintance with the testator prior to the making of the will. The defendant made the appointment with Mr. Rector for the writing of the will and was present when it was written. His uncle, who was his witness, testified that he and the defendant had a talk about the making of the will in which talk defendant told about making plain to the lawyer what his father meant at the time the will was written.

In Turner v. Anderson, 236 Mo. l. c. 539, it was said: "There is not a particle of testimony that Mrs. Anderson was instrumental in procuring Undue Influence. or drawing the 1905 will or in anywise hovered over the transaction." Mrs. Anderson was the wife of the testator in that case and the principal beneficiary under the will. In this case the testator, with much assistance on the journey, ar-

rived at defendant's house in June. After being there about two months, he went with the defendant and made his will giving to defendant nearly all his property, and at once went back home to be cared-for until his death by the daughter whom he had in a large measure disinherited. The facts in the case including the terms of the will itself made an issue as to undue influence.

II. Instruction 4 given for the plaintiff was clearly erroneous. It singled out the fact **Erroneous Instruction: Unequal Distribution.** of the inequality of the children under the will and called the attention of the jury to it. Such an instruction was condemned in Hughes v. Rader, 183 Mo. 711.

III. Instruction 1½d asked by de- **Old Age and Infirmity.** fendant was properly refused. It singles out facts for the attention of the jury.

IV. We will not decide, on the record as made, whether the court committed error in sus- **Testimony of Subscribing Witness.** taining objection to the question asked of the subscribing witness Ferrell as shown in the above statement. As the case must be retried, we are of the opinion that the subscribing witness should be permitted to state on what facts his opinion as to testator's mental capacity is based.

The judgment is reversed and the cause remanded. *Williams, C.,* concurs.

PER CURIAM.—This cause coming into Banc on a dissent, on a new hearing there the majority of the court (*Lamm, C. J., Bond, Walker,* and *Faris, JJ.*) are of the opinion that the giving of instruction 4 for contestants was reversible error; this for reasons given by *Graves, J.,* in his dissenting opinion for holding it error but not reversible error. The majority of the court concur only in the result reached in the Commissioner's opinion and not in all the reasoning; *Brown,*

Schieberl v. Schieberl.

*J.*, concurs in the Commissioner's opinion *in toto;* *Graves, J.*, dissents in a separate opinion in which *Woodson, J.*, concurs. The judgment is therefore reversed and the cause remanded.

GRAVES, J.—I do not concur with our learned Commissioner in the result reached in this case. The question of undue influence was abandoned when the contestants failed to ask an instruction on that branch of their case, and for present purposes need not be considered.

I agree with the Commissioner that the giving of instruction 4 for the plaintiffs was error. Gross inequality in the distribution of an estate is a circumstance which, when coupled with other circumstances, may tend to show mental incapacity, but standing alone it has no such tendency. The instruction should have coupled gross inadequacy in the manner here suggested.

Instruction No. 1½d was properly refused. Evidence of old age, sickness, bodily disease, and infirmities are all matters which are to be considered by the jury in determining the mental capacity of the testator. It is not always that a testamentary mind is found in an aged, decrepit, and infirm body. To say the least, it is common knowledge that the physical condition often affects the mind, and a jury has the right to consider the physical condition in determining the mental condition.

I think, however, the result reached by the opinion is wrong. The evidence so conclusively shows mental incapacity, that I do not believe the defendant has been harmed by this erroneous instruction 4. I think the verdict and judgment *nisi* is so clearly for the right party that it should be affirmed, and I so vote. *Woodson, J.*, concurs in these views.