JOSEPH FOWLER and JAMES CARTER FOWLER v. TALBOT A. FOWLER, DR. JOHN EMERSON ROBERTS, W. H. FRAZELL and HARRY T. FOWLER, Appellants.—2 S. W. (2d) 707.

Court en Banc, February 4, 1928.

*Thos. Brandon, Jr.* and *Harkless & Histed* for appellants.

*Cooper & Neel, B. J. Carver* and *Whitson Rogers* for respondents.

BLAIR, J.—Action to contest the purported will of Leavenworth Fowler, who will be referred to as "testator." Trial by jury in the

Circuit Court of Jackson County resulted in a verdict finding the paper writing, dated January 23, 1923, not to be the last will and testament of testator. Proponents appealed. The value of the estate fixes our appellate jurisdiction.

The contestants were Joseph Fowler and James Carter Fowler, who were named in the petition as plaintiffs, and Harry T. Fowler, who was therein named as defendant, but who filed an answer admitting the truth of the allegations of said petition. All of the contestants were brothers of the testator. The contestees were Talbot A. Fowler, the remaining brother of testator, and his wife Emma Fowler, Dr. John Emerson Roberts and W. H. Frazell.

By his purported last will and testament testator made no provision for his brothers Joseph, James Carter or Harry T. Fowler. He bequeathed $1000 to said Dr. Roberts and $2000 to said Frazell. The residue of his property was given to "Albert Austin" (Talbot Augustin) Fowler and his wife Emma jointly, share and share alike, the survivor to take the share of the other. While testator had apparently been quite wealthy at one time, his holdings had dwindled so that his estate was found to be about $10,000 after his death. He had no children. His wife predeceased him about four or five years. The four brothers were his only heirs at law.

Appellants (who were defendants and proponents below) offered attesting witnesses Murray and Fuqua who testified to the mental capacity of testator at the time he executed the will, offered the will in evidence and rested. Respondents then offered testimony in an effort to support the allegations of their petition that testator did not have sufficient mental capacity to execute a valid will and that the execution thereof was procured by undue influence exercised by appellants over the mind of testator. Appellants then offered testimony tending to prove the mental capacity of testator and the uninfluenced exercise of his will in the execution of the purported will. At the close of all of the evidence, appellants requested an instruction directing the jury to find for them and that the paper writing in evidence was the last will and testament of Leavenworth Fowler, deceased. This the trial court refused to give. The case was submitted to the jury upon the issue of the mental incapacity of testator to make the will in question and upon the issue of appellants' undue influence over the mind of testator. The only contentions of appellants in this court are that there was not sufficient evidence to authorize the trial court to submit the case to the jury on either of said issues and that the demurrer to the evidence should have been given.

Testator was about sixty years old at the time of his death. There can be no question concerning his mental capacity prior to a serious illness in 1921. He was a member of the Kansas City Board of Trade. He had lived in that city many years. His brother Harry also lived in

Kansas City and was on the Board of Trade, although they had nothing whatever to do with one another. Testator's wife committed suicide in the year 1919. After that he was alone in the world, except for his brothers. At one time he was "at-outs" with all four of his brothers. A reconciliation is claimed by appellants to have been effected between testator and his brother Talbot during the year 1919. Talbot also lived in Kansas City.

Testator was conceded to be a very heavy drinker and often came under its influence. He was possessed of a stubborn will and a strong personality. He was an agnostic and was outspoken in his opposition to the church and orthodox religion generally. He was particularly opposed to the entrance of America into the World War. He supported Woodrow Wilson in 1916 because he had kept America out of the war. When this country was finally forced into the war, he blamed President Wilson for it and cursed him and the flag and the country.

Testator was a man of very positive convictions and never hesitated to express them. He opposed all efforts to raise money for the war and abused others who undertook to help in that work. He even quarrelled with his wife over that matter and apparently such quarrels were a cause contributing to her suicide. The Board of Trade inaugurated a practice of devoting a moment each noon to silent prayer in aid of our arms. Testator ridiculed the practice and refused to recognize it, even to the extent of removing his hat during the moment of prayer.

The will in controversy was prepared by James H. Harkless, an able and prominent lawyer of Kansas City. Mr. Harkless and testator had an acquaintance of many years standing and familiarly addressed each other as "Jim" and "Lev." Mr. Harkless came to the home of Talbot Fowler on the morning of January 22, 1923, where deceased was at the time, and took notes so as to prepare the will as desired and returned the next morning, accompanied by attorneys Murray and Fuqua to act as attesting witnesses. Testator signed the will and the witnesses did likewise.

The testimony of Mr. Harkless and the two attesting witnesses tended very strongly to prove that testator was of sound mind and memory when he executed the will. On their part respondents introduced evidence of the mental incapacity of the testator which we think was sufficient to authorize submission of that issue to the jury. We will not undertake to go into the details of the evidence. Sketching broadly the evidence offered by respondents, we find that, prior to a sick spell in November, 1921, the testator was forceful, strongminded, keen and a good business man. He drank to considerable excess. This bad habit was having its effect and was then evidently bringing about a cirrhotic condition of his liver, which undoubtedly

was the specific cause of his death later. In November, 1921, he was sick in bed for five or six weeks at the home of Mrs. Ida Dillingham, where he had then been living several months. She had taken care of him before he went to her home to live. His trouble at that time was evidently delirium tremens, brought about by excessive whiskey drinking. He then suffered the hallucinations usually attendant upon that distressing condition of mind and body. •

There is evidence tending to prove that, after that spell of sickness, testator was never the same again, although he got upon his feet and again attended to his business on the Board of Trade. His eyesight and his hearing had become seriously impaired. His recollection began to fail. He would repeat the same statement two or three times during the course of a single meal. He became angry at the mention of war or soldiers or religion or even at trivial things and would talk loudly and rage and pound the table. He expressed an intention to commit suicide, as his wife had previously done. He blamed himself for her death because he had objected to everything she wanted to do. She shot herself with a pistol and cartridges which he had procured for some purpose. He said he might just as well have killed her with his own hands. As he grew more feeble he would cry about his wife.

Testator's wife had owned a long-haired, white poodle dog, upon which testator apparently lavished much of the affection he should have lavished upon his wife during her lifetime. The dog was old, decrepit, diseased, dirty and frequently suffered fits. From the descriptions of the dog given by the various witnesses, it must have been a pitiable but loathsome creature. Yet testator fondled it and petted it and took it to bed with him. We omit some of the disgusting details in this connection, although they have some bearing on testator's mental condition.

Finally the dog died while testator was not at Mrs. Dillingham's home. When he came back and found the dog dead, he wept and cursed. He blamed God, if there was a God, for taking his dog away. He announced that he would sleep that night with the body of the dead dog; but was dissuaded from that idea. However, he did insist upon burying it with some pomp and ceremony in a portion of his dead wife's finery. The entire Dillingham family participated with testator at the funeral in the yard and wept with him, partly because they were fond of the dog and partly out of sympathy for testator, of whom they were likewise very fond.

After testator's attack of delirium tremens and accompanying troubles in November, 1921, he moved away from Mrs. Dillingham's and went to the Bachelor Hotel for a while and later returned to her home. It was probably during his second stay at her home that the dog died. Testator then lived for a time at the Coates House. His health gradually got worse. He still continued his excessive drink-

ing of whiskey, most of which was of doubtful or injurious character. He finally got down sick again and was then taken to the hospital, where he only remained a few days until he left the hospital and was taken to the home of his brother Talbot, where he died about two weeks after having executed the will in controversy.

Lay witnesses offered by respondents testified to the foregoing facts and to their respective opinions that testator was not of sound mind toward the end of his life, including the date of the execution of the purported will. Respondents also produced medical witnesses who expressed the same opinion, based upon their observations of testator and in response to hypothetical questions.

When Mr. Harkless took the memorandum and later, upon the next day, when he read the will, testator appeared mentally bright and alert. While this is not necessarily conclusive of his mental capacity, respondents point to the testimony that Emma Fowler admitted giving testator drugs on two occasions and to the further testimony of the physicians that such drugs would tend to make testator mentally alert and talkative for a time. From such proof appellants put forward the ingenious theory that testator's physical and mental condition were such that Mrs. Fowler gave him the drugs to "dress" him for the occasion and to make him appear to Harkless and the attesting witnesses as competent to make a will. Regardless of whether there is any significance in this proof, counsel was at least entitled to make the argument to the jury for what it is worth.

Respondents lay considerable stress upon the fact that the name of Talbot Augustin Fowler was written in the will as "Albert Austin" Fowler. This is urged as evidence of unsoundness of testator's mind. We attach little importance to this incident because Mr. Harkless, who drew the will, testified that he misunderstood the name. The two names are so similar in sound that Mr. Harkless could easily have misunderstood testator when he gave him Talbot's name and testator could easily have failed to note the mistake when Mr. Harkless read the will to him. Testator did not read the will himself. However, it was a circumstance which the jury was entitled to consider for what it was worth, because the truth of the explanation of Mr. Harkless was for the jury.

We have purposely left out the testimony of appellants. It tended very strongly to prove that testator was of sound and disposing mind and memory. We are not here concerned with such testimony. Its truth was for the jury. We need only say that it was of such substantial character that it would have amply supported a finding by the jury that testator was of sound mind and disposing memory when he executed his purported will. Nor have we referred to any facts which might be considered as affecting the credibility of Mrs. Dillingham and other witnesses for respondents. Such credibility was also for the jury.

In determining the sufficiency of respondents' evidence, we must put the appellants' evidence out of consideration, save as it may aid respondents' case, and must accept respondents' evidence as entirely true and give respondent the benefit of every inference legitimately to be drawn therefrom. This rule is so well established that citation of cases is unnecessary.

Giving respondents the benefit of this rule and visualizing testator in the light of the testimony most favorable to respondents upon the issue of testator's mental capacity, we see a man, not old in years, but old in body, with mind burned out and body diseased by the excessive use of intoxicating liquor, with strength of mind and body rapidly failing, incoherent, wandering in mind, incapable of clear and continued thought, growing progressively worse from day to day. The will in question was written almost in the valley of the shadow of death, when he certainly was at least physically infirm. Upon such testimony, it was a question for the jury to determine whether testator had sufficient mental capacity to know the nature and extent of his property, who his relatives were and the claims, if any, they had upon his bounty, together with their respective needs and capacities, and what disposition he was making of his estate when he made his will. This rule is fully demonstrated by a few of the late cases cited by respondents: Hartman v. Hartman, 314 Mo. 305, 284 S. W. 488; Dunkeson v. Williams (Mo. Sup.), 242 S. W. 635; Post v. Bailey (Mo. Sup.), 254 S. W. 71; Ray v. Walker, 293 Mo. 447, 240 S. W. 187; Ard v. Larkin (Mo. App.), 278 S. W. 1063; Schieberl v. Schieberl, 261 Mo. 706, 170 S. W. 897; Byrne v. Fulkerson, 254 Mo. 97, 162 S. W. 171.

Appellants rely on the case of Archambault v. Blanchard, 198 Mo. 384, 94 S. W. 834. That case is quite similar to the case at bar in many of its essential facts, with this significant difference, however, that, in the case at bar and according to respondents' witnesses, testator was in failing health mentally and physically and almost ready for the grave when he made his will and this condition continued to grow worse thereafter until his death. In the Archambault case, testator was on his feet and about his usual duties when he executed his will and thereafter continued to go about his business as usual. His death thirteen days after the execution of his will was apparently due to a fall down a stairway, at the foot of which his body was discovered.

But, even if the two cases could not properly be said to be distinguishable upon their facts, the trend of the later cases, some of which have been above cited, is clearly in the direction of a more liberal view toward the sufficiency of testimony to make a case for the jury upon the issues of mental capacity of the testator and the

exercise upon testator of undue influence in the making of his will. Hence, we have concluded that the trial court did not err in submitting to the jury the question of testator's mental capacity to make the will at the time it was made.

We regard as more serious and difficult the contention that the case should not have been submitted to the jury upon the issue of undue influence. But, after a very careful study of the evidence, we have concluded that neither this court nor the trial court could properly say, as a matter of law, that there was no substantial evidence tending to prove such undue influence. It is true there is no direct or positive evidence of that fact, but there are facts and circumstances in the record which are difficult to explain upon any other theory. The exercise of undue influence upon a testator in the execution of his will may be proven by circumstantial evidence. Citation of cases upon the legal sufficiency of circumstantial evidence alone is scarcely necessary. The following cases, cited by respondents, fully illustrate the rule: Meier v. Buchter, 197 Mo 1. c. 91, 94 S. W. 883; Gott v. Dennis, 296 Mo. 1. c. 85, 246 S. W. 218, and Roberts v. Bartlett, 190 Mo. 1. c. 700, 89 S. W. 858.

It was proven, and was not controverted by a single witness, that, prior to 1919, testator and his brother Talbot were not on friendly terms. A letter offered in evidence tends to show that in 1918 testator was at least friendly enough with his brother Carter Fowler to write a letter to him, but he exhibited bitterness toward his brothers Talbot and Harry in that letter. The evidence also tends to show that testator afterwards felt that Carter and Joseph had not treated him right in the settlement of his mother's estate. He said that none of his brothers should have any of his property. Testator gave substantial evidence of this hostility when, in July, 1920, and after the alleged reconciliation with Talbot in 1919 and after writing the letter to Carter in 1918, he made a will giving the residue of his estate to Mrs. Dillingham, who had been good to him and taken care of him, with the remainder to her children after her death. In this will not one of his brothers was mentioned.

For reasons which need not now be recited, Mrs. Dillingham might well be regarded as an interested witness, but her testimony, the truth of which was exclusively for the jury, tended to prove that, after the alleged reconciliation between testator and his brother Talbot in 1919, testator expressed strong dislike and suspicion of both Talbot and Emma, his wife. He did not trust them. He told Mrs. Dillingham not to let them in to see him when he was sick and not even to let them know he was at her home. He said that he did not want Talbot's wife to have a penny of his estate. At one time when he was sick, he gave Mrs. Dillingham his keys so that a committee could go to his safe and remove some diamonds therefrom which he feared

that Talbot and Emma Fowler would get. The testimony offered by respondents tends to prove that this distrust and dislike of Talbot and Emma continued until a short time before testator was taken to Talbot's home.

We think there is no substantial basis for respondents' contention that confidential relations of such character and to such an extent existed between testator and Talbot that the burden was thrown upon appellants to prove that no undue influence was exerted upon testator by Talbot and his wife in the execution of the will. The proof of testator's distrust and dislike of Talbot, and particularly of his wife Emma, is clearly shown by respondents' evidence. If there is any proof of a relation of trust and confidence existing between Talbot and testator, it is found in the testimony of Emma Fowler describing the alleged beautiful and thoroughgoing reconciliation between the brothers, the existence of which reconciliation is contrary to much of the proof made by respondents. At most that reconciliation was nothing more than the restoration of normally friendly relations between estranged brothers.

There was evidence tending to show the solicitous concern of Emma Fowler and the wife of Dr. Roberts that testator should make his will. The will which he had made in July, 1920, was apparently satisfactory to him until the time he was taken to Talbot Fowler's home. There is proof that Emma Fowler and Dr. Roberts gave orders, while testator was sick at Mrs. Dillingham's home, that none of his other brothers should be admitted. The brothers living in Kansas were not even notified of testator's death. At one time when testator wanted to go to Mexico, Dr. Roberts insisted on accompanying him. Testator's wealth was doubtless estimated to be much greater than his estate actually turned out to be and such overestimate may account for some of the solicitude that he make a will, which was exhibited by those who eventually turned out to be beneficiaries thereunder, except Mr. Frazell. He appears to have been a lifelong friend of the testator. He was a beneficiary under both wills.

With evidence tending to show dislike, suspicion and distrust of Talbot and Emma by testator, continuing up to a short time before his death, with proof that testator's physical and mental powers were rapidly failing, we find Talbot and Emma Fowler seeking out testator at the hospital where he was lying ill and where he had previously been found by some of his friends to be unconscious or in a comatose condition. Although, if respondents' evidence is accepted, testator had previously disliked and distrusted Talbot and Emma Fowler, nevertheless they took him to their own home, from which home the rest of the world, including his close friends and brothers, were zealously excluded. What happened there is a closed book, so far as the record is concerned.

Seven or eight days later Emma Fowler telephoned to Mr. Harkless to come and see testator, as he wanted to make a will. We see no great significance in the mere absence of Talbot and Emma on the day the memorandum was prepared and the next day when the will was read to testator and signed by him. If the beneficiary is absent contestants point to a stage all set and hint that the absence of the beneficiary is significant of his implicit confidence that the influence previously exerted is entirely efficacious. On the other hand, if the beneficiary is present when the will is executed, his very presence is pointed to as evidence that he dares not leave the testator for a single moment lest he get out from under his malign influence. Thus the poor beneficiary is damned if he goes and damned if he stays. We have yet to find the beneficiary whose conduct, during the execution of the will, met the contestants' ideas of propriety.

All these matters were for the jury to consider. If the jury found that testator's disposition of mind as previously expressed, was hostile to Talbot and Emma Fowler, that they had previously displayed anxiety that testator make his will, that he was taken to their home hopelessly sick and mentally weak and there he was exclusively under their care and control, that seven or eight days later he suddenly and unexpectedly became able to get up and to display an apparently alert mind and then made a will in their favor, directly contrary to his intention theretofore often expressed, that he soon thereafter died from the fatal ailment with which he was grievously stricken when he went to Talbot's home, then the jury had the right to say that the will, made under such circumstances, was the result of undue influence exercised by those who had the opportunity, and to whose advantage it was, to exercise such undue influence.

We are forced to the conclusion that the trial court did not err in submitting the case to the jury upon the issue of undue influence.

The conclusions reached upon the propriety of submitting the case to the jury on the issues of testator's mental capacity and the undue influence, alleged to have been exerted by the beneficiary, dispose of all of the assignments of error made in appellants' brief in this court and necessitate the affirmance of the judgment of the trial court. It is so ordered. *White, P. J.,* concurs; *Walker, J.,* dissents.

PER CURIAM:—The opinion of BLAIR, J., in Division Two is adopted as the opinion of Court en Banc. All concur, except *Walker, C. J.,* who dissents.