ROBERT RICKER NORTON v. MABEL JOHNSON and ST. LOUIS UNION TRUST COMPANY, a Corporation, Executors of the Purported Last Will and Testament of ELLEN A. RICKER, Deceased; SEAMEN'S CHURCH INSTITUTE OF NEW YORK, a Corporation, BOARD OF TRUSTEES OF MISSOURI BOTANICAL GARDENS and AMERICAN NATIONAL RED CROSS, St. Louis Chapter, a Corporation, Appellants, JENNIE DAY, LUELLA IRENE NORTON COLE, EDWIN KNIGHT NORTON, BETH REED, and MARY E. NESMITH, Defendants, No. 41322—226 S. W. (2d) 689.

Division One, January 9, 1950.

Rehearing Denied, February 13, 1950.

1216

*Bryan, Cave, McPheeters & McRoberts, Thos. S. McPheeters* and *Edw. A. Haid* for Mabel Johnson and St. Louis Union Trust Company, Executors, *Lehmann & Allen, Chas. Claflin Allen* and *O. P. Owen* for Seamen's Church Institute of New York, Board of Trustees of Missouri Botanical Gardens and American National Red Cross, St. Louis Chapter, appellants.

1218

*Clay C. Rogers, Julius H. Drucker, John J. Nangle* and *Harvey B. Cox* for respondent; *Mosman, Rogers, Bell, Field & Gentry* and *Cox & Cox* of counsel.

1222

BRADLEY, C.—This cause contests the purported will of Ellen A. Ricker, deceased. The jury returned a verdict against the will; judgment went accordingly and this appeal followed. Respondent filed motion to dismiss the appeal for the alleged reason that appellants violated Rule 1.08 in failing to make a fair and concise statement without argument. The motion is overruled.

The will was executed July 6, 1944; testatrix died April 4, 1946, in her 88th year. April 26, the will was admitted to probate in the probate court of the City of St. Louis, and letters testamentary were issued to the executors, appellants St. Louis Union Trust Company and Mabel Johnson. The estate was of the value of $1,042,670.99, and consisted almost entirely of stocks and bonds; there was no real property. Hereinafter, for the most part, we refer to the testatrix as Miss Ricker and to appellant Mabel Johnson as Miss Johnson; they are most generally so mentioned throughout the record of over 1,000 printed pages.

Miss Ricker was never married; her only heirs were six cousins, five on her mother's side and one on her father's side. These are Robert Ricker Norton, respondent, and defendants Jennie Day, Luella Irene Norton Cole, Edwin Knight Norton, Beth Reed, and Mary E. Nesmith. The last named is the cousin on the father's side. None of the defendant cousins except Miss Nesmith filed answer. Respondent resides in San Mateo, California; Beth Reed resides in Stockton, California; Mary E. Nesmith in Portland, Maine; and the others reside in Weeping Water, Nebraska.

Item 1 of the will directed payment of debts and funeral expenses; item 2 bequeathed to each of the cousins $5,000.00, except Miss Nesmith; she had been otherwise provided for by a gift of $10,000.00 in government bonds; item 3 bequeathed to Miss Nesmith "my stamp

collection and such furniture as she shall designate within ninety days after my death''; item 4 directed the executors to purchase a suitable tombstone for Miss Ricker and her deceased sister, Mrs. Grace Small, and to have proper inscriptions placed thereon and to have the same erected on the family burial lot in Portland, Maine. Item 5 authorized the executors to sell jewelry, furniture, pictures, etc., the proceeds to go to the residuary estate; item 6 directed the executors to pay all estate, transfer, and inheritance taxes out of general assets and directed that such taxes should not be charged against any bequest; item 7 provided that if any legatee or legatees contested the will then the bequest to such legatee or legatees would go to the residuary estate; item 8 bequeathed one half of the residuary estate to appellant Seamen's Church Institute of New York City, and one fourth of the residuary estate to each of appellants Board of Trustees Missouri Botanical Gardens (Shaw's Garden) and the St. Louis Chapter of the American Red Cross; item 9 named appellants Miss Johnson and the St. Louis Union Trust Company as executors, and provided that if for any reason Miss Johnson could not serve, then the trust company would be the sole executor; the executors were to serve without bond; also, item 9 recited that Miss Ricker had advice of counsel relative to the will ''from some person not under salary'' from the St. Louis Union Trust Company.

Respondent (contestant) alleged that the purported will is void because at the time of its execution and for a long time prior thereto Miss Ricker ''was feeble in both mind and body; that her mind and memory had become and were impaired, and that she had become of unsound mind''. It was further alleged that the purported will was void because appellant, Miss Johnson, knowing the condition of the deceased, unduly influenced and prejudiced her mind ''in the making of said purported last will and testament, and by request, entreaties, misrepresentations, false statements, directions and overpersuasions, prevailed upon her to make said purported will * * * ''.

The executors answered jointly; denied allegations as to unsound mind and denied the alleged undue influence on the part of Miss Johnson. The Seamen's Church Institute, Shaw's Garden, and the Red Cross filed joint answer to the same effect as the answer of the executors. Each of the answers alleged that the will was executed intelligently, understandingly, voluntarily and without control, dominance, influence or suggestion from anyone. As stated, none of the defendant cousins filed answer, except Miss Nesmith; it is not necessary to make any statement about her answer; she did not contest the alleged will, and was not represented at the trial.

Miss Ricker was the daughter of Colonel Robert E. Ricker and Ellen Sawyer Ricker. Colonel Ricker was a civil engineer; came to St. Louis with his family, his wife and two daughters, during the days when the Iron Mountain Railroad was building; he was one of

the inventors of the Westinghouse air brake and received a substantial amount of Westinghouse stock which was the foundation of the family fortune. Colonel Ricker died intestate in 1894. The body was first interred at Weeping Water, Nebraska, and later moved to Portland, Maine. He left surviving his widow and the two daughters, Miss Ricker and her sister, Jessie Grace Ricker. In a year or so after the death of Colonel Ricker the widow and the two daughters moved from the home in St. Louis to the Southern Hotel. Mrs. Ricker, the widow, in 1909, became ill and employed appellant Miss Johnson, a trained nurse, to care for her. She was never thereafter well, and died intestate in 1914. Miss Johnson, upon the death of Mrs. Ricker, was employed by Miss Ricker and thereafter continued in her employ acting as a companion and nurse. Miss Ricker was born October 19, 1858, and was 51 years old when Miss Johnson came into the family and was 56 when she employed Miss Johnson. Jessie Grace Ricker, sometime prior to 1909 when Miss Johnson was employed, married a man named Small and did not thereafter live with the family until her husband died in the 1920s, perhaps in 1924. Mrs. Small came back to St. Louis in 1924, after her husband's death. She died intestate and without descendants in 1927, and Miss Ricker thereupon became the owner of the entire Ricker fortune. The value of the inheritance from Mrs. Small in 1927 was $350,000.00.

The Southern Hotel closed in 1912, and Mrs. Ricker, Miss Ricker and Miss Johnson went to the Planters Hotel, where Mrs. Ricker died in 1914, as stated. The Planters closed in 1922 and Miss Ricker and Miss Johnson went to the Jefferson Hotel. Miss Ricker, Mrs. Small, and Miss Johnson had separate rooms at the hotels where they resided, and Mrs. Small died at the Jefferson. The bodies of Mrs. Ricker, the mother, and Mrs. Small were taken to Portland, Maine, for burial.

The evidence tended to show that Miss Ricker did not lead a normal life; never went to school, and what educational training she had was by private tutors; she never went to church or had a boy friend; she had none of the usual activities of youth. Until her death she dressed in the fashion of the old day; wore long black dresses and hightop lace shoes. For the most part she remained alone in her hotel room, and in her home room before her father's death.

Appellant makes 16 specifications or assignments of error. These may be grouped as follows: (1) On the refusal of the court to direct a verdict for the alleged will; (2) on what appellants term the submitting of the question of undue influence on the part of Miss Johnson; (3) on the admission and exclusion of evidence; (4) on the refusal of withdrawal instructions; and (5) on argument.

The first assignment goes to testamentary capacity and undue influence on the part of Miss Johnson in so far as the latter issue is to be considered.

Appellants (proponents) went forward with the evidence; called as witnesses two of those who were witnesses to the will, John Torrey Berger and W. G. Frazier. A third witness to the will, Dr. Louis H. Hempelmann, was deceased at the time of the trial. Appellants also introduced the will, and the affidavit of Dr. Hempelmann made in connection with the probate of the will. Much of the evidence we narrate in the first person. It would be difficult to properly reflect this story in much less space than we have used.

Mr. Berger, an attorney, testified that on or about July 1, 1944, W. G. Frazier (with appellant St. Louis Union Trust Company) called and asked to see him about preparing a will for Miss Ricker and that he went to Mr. Frazier's office. Mr. Frazier gave him a memorandum (in the handwriting of Miss Johnson) of the specifications of the proposed will. After talking with Mr. Frazier about the will Mr. Berger went back to his office and prepared a rough draft of the will, based on the memorandum and what Mr. Frazier told him. Mr. Frazier made arrangements for Mr. Berger to call upon Miss Ricker, whom he (Berger) did not know, to discuss (July 5th) the matter of the will with her at the Jefferson Hotel. He (Berger) arrived at the hotel; was introduced to Miss Ricker and Miss Johnson by Mr. Frazier who was there when he (Berger) arrived; he did not know whose room it was. Mr. Berger said that Miss Ricker spoke to him; that she was an elderly lady and was sitting in a rocking chair. He said he showed her the draft of the will and asked her if she wanted to read it or would she prefer that he read it and she said for him to read it and that he read it paragraph by paragraph. At the end of each paragraph he asked her, "Is that what you wish?" and she said, "Yes". It was his recollection that at least on one paragraph she had some ideas about addresses and she gave the address of one party. The only address she was certain about was Robert Ricker Norton, San Mateo, California; she gave that address herself. All the discussion at that time relative to the will was with Miss Ricker. He did not recall that Miss Johnson said anything. He explained to Miss Ricker, he said, that the Seamen's Church Institute was a nonresident charity, and that there would be a Missouri tax imposed upon whatever amount that charity received, but that she was emphatic about the fact that she wanted them to get half of the residuary estate.

Mr. Berger said that he also explained that if she left one fourth of her estate to the National Red Cross there might be a tax on that, too, as that chartiy might be construed as a nonresident, but that if she wanted to leave it directly to the St. Louis Chapter of the Red Cross he thought there would not be any tax, and that Miss Ricker then said she wanted it left to the St. Louis Chapter the way he had written it in the draft. He said that after they had gone over the rough draft of the will she instructed him to prepare the final draft, and that he explained to her that it was necessary to have at least

two witnesses, and that in his practice he had the habit of having three witnesses, and suggested that he and Mr. Frazier could act as two of the witnesses. He said he asked her if she had anyone in mind and she didn't, and he suggested her family doctor as the third witness. He did not recall that she told him who her doctor was. He said that his reason for making the suggestion was because Miss Ricker was a woman who was along in years. · Mr. Berger said that they agreed to meet next day at 4 o'clock with the witnesses and the final draft of the will and that when he arrived at the hotel July 6th, Miss Ricker, Miss Johnson, Mr. Frazier, and another (Dr. Hempelmann) were in the room and that he was introduced to the doctor. He said that he read to Miss Ricker the final draft, paragraph by paragraph, and in each case she said that was what she wanted, with one exception, which Mr. Berger said was "rather vague" in his mind; that was concerning the stamp collection mentioned in item 3 (Miss Ricker did not have a stamp collection). Mr. Berger said that she said something about it, and that it seemed unimportant to him at the time and that he advised her that he didn't think a change was necessary and that was all right with her; he said he assured her there was nothing to worry about and let it go at that.

Mr. Berger said that after they went over the will he asked Miss Ricker if she wanted to execute "this instrument" and she said she did, and he said, "Do you declare this to be your last will and testament?" and she said, "I do", and that Miss Ricker filled in the date, July 6th, and "formally executed the will"; that it was properly executed and witnessed. Mr. Berger said that he was of the opinion that Miss Ricker was of sound mind and disposing memory.

On cross-examination Mr. Berger said that the St. Louis Union Trust Company occasionally referred clients to him; that he did not know in whose handwriting the memorandum given him by Mr. Frazier was; that he had learned that it was in the handwriting of Miss Johnson. (The provision in the will that Miss Ricker had advice of counsel not employed by the St. Louis Union Trust Company was not in the memorandum.) As to this Mr. Berger said he read this provision to Miss Ricker and she said that was what she wanted. Mr. Berger said he got the stamp collection idea from Mr. Frazier; that Mr. Frazier told him that he talked to Miss Ricker. "Q. Did he, Mr. Frazier, tell you he got directions to make a will from Miss Ricker or Miss Johnson? A. I don't remember."

Mr. Frazier testified that he first met Miss Ricker in 1927 when her sister, Mrs. Grace Small, died. He said that Miss Ricker came in (St. Louis Union Trust Company) to inquire whether he would act as administrator of her sister's estate and how much we would charge; that he discussed the matter with her and agreed to act for the statutory fee of five percent, and that the trust company acted as · administrator of the estate; that the estate was in excess of

$300,000.00; that he did not see Miss Ricker again, after the administration of her sister's estate was closed, until the early part of July, 1944; that Miss Johnson then called him; made inquiry as to what we could do to assist Miss Ricker in the handling of her property, first in an agency or living trust, and second, Miss Johnson mentioned that "she (Miss Ricker) had been giving thought to a will". When Miss Johnson came in, Mr. Frazier said he suggested that "she have Miss Ricker give a memorandum of what she wanted"; that he later saw Miss Ricker in a room (he later learned was Miss Johnson's) at the Jefferson Hotel and discussed the matter with her; that Miss Ricker recognized him, and called him by name; that Miss Johnson was there. He said that in the conference Miss Ricker mentioned Mr. Post (with the trust company), but that she didn't like him because he had suggested she sell her Westinghouse stock. He said that what he first discussed with Miss Ricker was about a trust or agency; that he felt she might need "our services" in handling her securities, clipping coupons, etc., and that she was not interested in that, and said that she wanted to prepare a will. He first saw the memorandum, he said, at the second meeting with Miss Ricker, and that it was discussed with her; that her cousin, Mary Nesmith, was mentioned and she said she had already made provision for her by government bonds. She also mentioned some prior provision for Miss Johnson but gave no details, he said. (Miss Ricker had theretofore given Miss Nesmith $10,000.00 in government bonds and Miss Johnson $77,000.00 in government bonds.) Mr. Frazier said Miss Ricker told him something of the work of Seamen's Church Institute; said she didn't want to leave her relatives anything and asked if she had to, but finally said she would and "added the contest clause to give them nothing if the will was contested". (The contest provision is the last on the memorandum; is in Miss Johnson's handwriting and reads: "She (Miss Ricker) said if contested, the contestant to be cut off with $1.00."

Mr. Frazier said he recalled no discussion of a stamp collection; that an album was mentioned (Miss Johnson testified it was a scrapbook that was mentioned). Just how Mr. Berger got the stamp collection idea was never cleared up. Mr. Frazier said that he told Miss Ricker that the trust company could not prepare a will, and asked her if she had an attorney, and that she said she did not and "asked me to suggest one". When Mr. Frazier got back to his office he called Mr. Berger who went over and Mr. Frazier gave him the memorandum. Mr. Frazier gave about the same version of what occurred when Mr. Berger went over the rough draft of the will with Miss Ricker as did Mr. Berger, and about the same version of what occurred when the will was executed as did Mr. Berger. He gave it as his opinion that Miss Ricker "was entirely competent; knew exactly what she wanted".

When appellants (proponents) closed with their prima facie case, respondent (contestant) proceeded with his evidence. Joseph H. Priest, an employee of the Jefferson Hotel for 10 years and a room clerk for 4 years, testified: ''I first saw or met Miss Ricker (he knew her as Miss Rickert) in Miss Johnson's room (628) in the early part of 1942 when I started as a private waiter; I went to take food to that room; Miss Johnson was present; she (Miss Johnson) was present on all the occasions I saw Miss Ricker; I served Miss Ricker two meals a day, breakfast and dinner, until the midsummer of 1943. Miss Ricker was a very old lady, wore hightop shoes, black stockings; I would always try to speak to her; I never did get any response from her; Miss Johnson always did the talking; I spoke to Miss Ricker on every occasion, but Miss Johnson responded. When any ordering was done Miss Johnson did it; Miss Ricker never gave an order; she was always sitting in a rocking chair (when he saw her). The table (used in serving meals) was on coasters; I would push the table up to her; on many occasions she would jerk the table and shake it; there was no occasion for such; Miss Johnson on such occasions told her to keep quiet; the response (on being told to keep quiet) was nothing but mumbles; she (Miss Ricker) didn't speak any audible words you could understand. I found her tearing up paper; torn up in little bits and thrown on the floor; she never talked; it was always mumbles. I always brought a food check with the meals; Miss Johnson always signed the food check. Miss Ricker had no expression; she had a very starey look.

''I would pick up her mail in the morning; always handed the mail to Miss Johnson; would always go by Miss Johnson's room; Miss Johnson told me that I should not go to Miss Ricker's room (614) with food without coming to her room first; I carried a small table that could be shouldered like a tray; the door to Miss Ricker's room would be unlocked by Miss Johnson and I would enter. In Miss Ricker's room the furniture was old; other rooms had new furniture; newspapers were stacked up against the wall; on many occasions I saw these bits of paper scattered over the floor; Miss Ricker did not wear glasses; I never knew of any one visiting Miss Ricker; Miss Johnson would always tell Miss Ricker that breakfast or dinner was there; lots of times I heard Miss Johnson say to Miss Ricker, 'This is your eggs; you must eat'. When she would be shaking the table Miss Johnson would ask her to be quiet and she would always quit. Sometimes Miss Ricker would hesitate about eating her food, and Miss Johnson would say, 'Eat your food', and she would; she always did as Miss Johnson said. I saw Miss Ricker 6 days a week, twice a day'' (during the time he was there from the early part of 1942 until midsummer 1943). He gave it as his opinion that Miss Ricker was of unsound mind.

Earl Heckel, a painter employed at the Jefferson Hotel for 18 years, painted rooms, halls and decorated, testified: ''I knew Miss Johnson

and knew Miss Ricker (as Miss Rickert) until her death in 1946; knew her almost 16 years; I knew Miss Johnson as Miss Ricker's nurse. The furniture in Miss Ricker's room was the oldest we have; it was hotel furniture. I went in Miss Ricker's room only on housecleaning; she would be sitting in a rocking chair or on the bed; when I would go in her room I would say, 'Good morning', or 'Good afternoon', whatever time of day I went there; when I tried to talk to her I got no response; she was always hunched over; she had a blank look in her face; just stared into space. The only way I could get in Miss Ricker's room was through Miss Johnson. I have heard Miss Johnson caution Miss Ricker to be quiet. The waiter went in and put the tray down; Miss Ricker said, 'Is that all I get, oatmeal every morning?' Miss Johnson said, 'Be quiet; that is good enough for you'. I saw Miss Ricker frequently until 1941; after that infrequently; so far as I know Miss Ricker was never out of her room. The last time I was in her room was in 1942 when I painted it.'' The witness said that it was his opinion that Miss Ricker was of unsound mind.

Mrs. Willie Mae DeBaun was assistant housekeeper at the Jefferson Hotel from 1927 until 1935, and then was away until July, 1942, when she returned to the hotel; knew Miss Johnson and Miss Ricker (as Miss Rickert) since 1927. ''When I spoke to her and called her Miss Rickert she never corrected me or told me her name was not Rickert. I knew that Miss Johnson was the nurse or companion of Miss Ricker; I think Miss Johnson said that was what her duty was there. When I would be in Miss Ricker's room Miss Johnson would give the orders; Miss Ricker did not; she would be sitting in a chair; she wouldn't have anything to say; Miss Ricker never dressed very nice; she would always have peculiar long clothes on. I don't know that I ever had any conversation with her; I would say, 'Good morning' or 'Good afternoon'; maybe she would grunt, maybe she wouldn't; most of the time she wouldn't speak to me; you couldn't have any conversation with her; Miss Johnson would let me in Miss Ricker's room. When I came back in 1942 Miss Johnson said, 'Miss Ricker, don't you know who this is? She was here before; you know who she is'. At no time (after the return to the hotel in 1942) did she ever give any indication by word or look or anything of that sort that she had any knowledge or recognition of me. She was changed quite a bit; she was very pale without any expression whatever, petrified, looked like a statue; that is what I observed after I came back in 1942. When sitting in the chair she would be stooped over like; I have heard her mumbling; wouldn't be talking; just mumbling; wouldn't be saying anything you could understand. She would tear fine pieces of paper and put it in the waste basket; little bits. Miss Ricker's underwear was as black as my purse; it was originally white; it was dirty. If Miss Johnson would hear us in Miss Ricker's room she would come

in.'' The witness gave it as her opinion that Miss Ricker was of unsound mind.

Mrs. Margaret Cates, a registered nurse for 18 years, was one of the nurses employed July 31, 1944 (the will was executed July 6, 1944). Mrs. Cates testified: ''When I first saw Miss Ricker she was sitting with her head bowed and sort of mumbling; talking irrational; I could not make out what she was saying; she had no control of her bowels or her kidneys and she was sitting there in that condition when I came in; she had a terrible pressure sore at the end of the coccyx; the pressure sore was quite large and at the time was bleeding; inflamed all around the area; I have never seen a pressure sore quite that bad; at first it looked like it might be infected. Miss Ricker was very weak; couldn't stand alone; she didn't talk; had nothing to say; only this mumbling which was incoherent. I was on night duty, but the morning she died (April 4, 1946) I remained until about 10 o'clock, about an hour before she died; she was in a coma 5 or 6 days before her death.

''During all the time I was there Miss Johnson was in charge of Miss Ricker and her affairs, and all the time I was there I never heard Miss Ricker utter any words except yes and no. Her skin was sort of dried; she was thin and peaked-looking; no expression to amount to anything in her face; she had other nurses; her condition was such that she had to be fed and that was true the first day I went on. She was in a chair when I went on, and Miss Johnson said, 'She (Miss Ricker) never goes to bed; she even sits in a chair and sleeps; she has been sleeping in the chair day and night for some time; I got her to bed that night; we set her up straight in bed; we almost had to carry her to bed. Miss Boston was on morning duty; Miss Johnson afternoon duty. The bowel and kidney condition continued for every bit of 6 months and then seemed to pick up a little and then came back, you know. She would call for the bed pan when she was on it; that happened frequently about a year before she died.

''About 6 or 7 days after I had been there Miss Johnson said, 'Did you know Miss Ricker made out a will?' I said, 'No, I didn't', and she said, 'Well, she just made out a will shortly before you nurses came', and I said, 'Really? I wouldn't think it would be legal with her mental condition like it was', and I said, 'Do you know what the will has got?' and she said, 'Yes, it contains the relatives, the relatives are left $5,000.00 apiece if they don't contest the will'. She said, 'The Seamen's Institute of New York was left quite a bit and the American Red Cross and Shaw's Garden was left quite a bit'. I said, 'How come she hasn't made out a will until just lately?' and she said, 'Well, she just never had one', and I said, 'Well, that will wouldn't be legal; I know it wouldn't in her condition; this sort of thing from the looks of her didn't come on suddenly; she must have been like that', and she said, 'The doctor signed the will'. I saw packages, two

or three, in the room that I learned later contained bonds; Miss Johnson said that there were quite a few bonds (in the packages); that there was an awful lot of expensive bonds in there.'' The witness gave it as her opinion that Miss Ricker was of unsound mind.

Mrs. Mareta Chamness, a registered nurse for 20 years, went on duty as a nurse for Miss Ricker August 1, 1944, and served as nurse for 3 months from 7 a. m. to 3 p. m. Mrs. Chamness (formerly Miss Boston) testified: ''I would try to draw her in conversation, try to interest her in something, but she might just answer yes or no, would be just about all. A few days after I went on the case I asked her if she had any relatives in the city, as there had been no one to visit her, and she said no. I said, 'Do you have any relatives at all?' and she said, 'I have a nephew, Robert Norton, in California, and a cousin in Maine', and that was the extent of the information I was able to get. I didn't know that Robert Norton (respondent) was not a nephew of hers. When I went on duty I found her very much in need of nursing care. Her body and her scalp especially was very much in need of care; I asked if I could get her a hairdresser and Miss Johnson got a hairdresser who came and washed her hair. She did not have very many teeth, but she did have one in front that was loose, was cutting her lip and caused her to drool; when she sat in the chair she would lean over and drool. Miss Johnson was in charge of the room, I would say. I kept bedside notes and left them in the dresser in the room. (These notes and notes of other nurses were turned over by Miss Johnson to her attorney; they were not introduced.)

''There were lots of papers and boxes in the room. Miss Johnson said bonds were in the boxes and an .accumulation of unclipped coupons over a period of years. She never told me how much, but she was still looking at them and I know she commented that she had found five thousand so far, but she was just beginning. Miss Ricker did not say anything about the bonds. Miss Ricker cut out cartoons and comic strips from the papers and eventually put them in the dresser drawer. I never looked in the dresser drawers except to help her to the dresser and support her while she was standing there. Miss Ricker had a pressure sore at the base of her spine. She didn't like to be bathed; she would giggle and pull away from you; she didn't like to lie down to be bathed; she insisted on sitting in the chair; she objected to having her feet bathed; she seemed more tickled than anything else and would just giggle and pull her feet away and sometimes she would screech out very loud. She was incontinent [698] part of the time. If she was in bed or in the chair, she would, instead of asking for the pan, soil the bed or chair, wherever she happened to be. She would be in bed of mornings when I got there. I always dressed her. When up she sat in the chair with her head hanging forward occasionally; I would give her the paper, but if she ever read anything to understand it I don't know; she would never

answer me if I would comment on the news. Miss Johnson made out my checks and Miss Ricker signed them; when Miss Johnson told her to sign the checks she signed them. The doctor was there to see her one time while I was there." Mrs. Chamness gave it as her opinion that Miss Ricker's mind was unsound.

Grover Scott was a room service waiter at the Jefferson Hotel from October, 1943, until April, 1946. He testified: "I went to Miss Ricker's room once a week and sometimes more often when the other boy wasn't there. When I would go up with the meals she would be sitting in a chair with her head bent down tearing little papers. I would push the table up in front of her, and if a little bit too close she would grab the table and shake it and make funny noises; I never heard her talk. Miss Johnson would get the table and help me push it up to her and Miss Johnson would sign the food check. When I would take a meal I would speak to Miss Ricker, but she never responded; never talked that you could understand; she would be grunting and tearing little pieces of papers in small parts, dropping them on the floor, always bent over. I never heard her utter a single sentence." The witness gave it as his opinion that Miss Ricker's mind was "unsound, perfectly unsound".

Mrs. Myrtle Dobson was executive housekeeper at the Jefferson Hotel from 1927 until 1935; was away then until 1942; had known Miss Ricker and Miss Johnson since 1927. Mrs. Dobson testified: "Miss Ricker knew me perfectly prior to 1935, but after I came back, I happened to be on that floor and Miss Ricker's door was open and I said, 'Hello, Miss Ricker, how are you?' She looked at me very blankly. I said, 'Don't you remember me? I was here before as housekeeper a long time'. She said, 'Who are you?' I explained that I had been there before and she didn't remember me; she never knew me after that. I never got any intelligible response from her; all she would say was, 'I don't know you'. When I came back she had broken a lot; she looked ill. When I came back she looked very blankly; she was all stooped over and her hands looked drawn. I never saw her only when she was sitting in a chair. All the arrangements, after I came back, concerning her room were made with Miss Johnson. Every time I saw Miss Ricker she had on dark clothes and real long skirts. I saw her underwear; I saw what (underwear) Miss Johnson gave the maid when she (Miss Johnson) cleaned the trunks out. It was gauze; they were new, but had never been laundered; they were dirty; they had been packed that way in the trunk for years." Mrs. Dodson gave it as her opinion that Miss Ricker was mentally ill.

Lee Brent worked as extra waiter at the Jefferson from 1942 until December, 1946. "I worked one day a week. When I went to the room to serve her, I would say, 'Good morning, Miss Ricker' (he called her Rickert); she would not seem to say anything; she never

talked to me; I served breakfast and dinner. She would be sitting there with her head down; I would roll the table up to her and she would grab it and shake it lots of times until Miss Johnson would quiet her down; tell her to be quiet and she would respond. At times she would shake the table hard. She would be cutting paper at times; sometimes she would kind of slobber; her head bent over slobbering; seemed to me like she wasn't at herself." The witness gave it as his opinion that Miss Ricker was of unsound mind.

Herman Speaker was employed by Miss Ricker as chauffeur from December 7, 1928, until May, 1941, and served as chauffeur six days a week during that period. He testified: "In the beginning there was small bits of conversation with Miss Ricker about the weather, the birds, whatever we happened to see, but other than that there was nothing. I would call Miss Johnson in the morning; I would came down at a certain hour; if it was in the morning it would invariably be to take Miss Johnson to one of the banks or Scruggs-Vandervoort. In the afternoon, in the beginning, we (he and Miss Johnson) would take Miss Ricker to a show once a week. We (the three) would go for a ride in the afternoon about 4 or 5 days a week. Miss Johnson told me it was her car; it was kept at the Federal Garage. I never got directions from Miss Ricker; always Miss Johnson, except two or three times. I took Miss Ricker out alone a couple of times to the bank or library. She drew away from people; she would pull back when they got near her. I heard the death of her sister (Mrs. Small) mentioned one time; that was when Miss Johnson was trying to get her to consent to put a headstone to her grave. Miss Ricker said that she did not want to be bothered about it. I never heard her start a conversation. Sometimes we (the three) went to the Zoo and she would go through and look at things; she would say 'funny bird', 'pretty bird', 'Look at the robin'. I never discussed the stock market with her; I discussed current events with Miss Johnson. Miss Ricker mentioned the Seamen's Church Institute and Father Dempsey; she thought he was doing good work; that was prior to 1936.

"In 1937 or 1938 I noticed a change in Miss Ricker's condition of health and her movements. Her times for going out for a ride were cut down; when Miss Ricker did not go, I chauffeured Miss Johnson around; took her to the banks. I was in Miss Ricker's room three or four times in all the time I knew her; went in two or three times to pick up packages addressed to Dempsey-Tegeler or the Mercantile (an Investment Securities Company and the Mercantile Commerce Bank & Trust Company). The address was in the handwriting of Miss Johnson. Miss Ricker gave me the packages; Miss Johnson directed me where to take them. On one occasion I took Miss Ricker and Miss Johnson down town, dropped Miss Johnson at Vandervoort's and took Miss Ricker to the Mercantile and assisted her into the bank and then found a parking place. Miss Johnson thought we were lost;

she couldn't find Miss Ricker; I said I would go and see if she was at the hotel; I went to Locust Street and found her in front of Speck's. I picked her up and got Miss Johnson and took them to the hotel. When Miss Ricker would come out of any place at all, if I wasn't right there she would invariably head for the nearest shiny car; one time she got in the wrong car. In later years the door to Miss Ricker's room was always locked and Miss Johnson would unlock it from the outside. I went into the Navy in May, 1941, and didn't see Miss Ricker again until in November of that year when we had lunch in the room; Miss Johnson ordered the lunch. Miss Johnson said, 'Here is Herman', and she wanted to know how my family was. I spoke to her several times to bring her into conversation; she didn't answer me. I saw Miss Ricker a few times in October, 1945, at the hotel." The witness, from his experiences with Miss Ricker, gave it as his opinion that when he left in 1941, Miss Ricker was of unsound mind.

Mrs. Herman Speaker, following her husband, was chauffeur for Miss Ricker from May, 1941, when her husband left, until the latter part of January, 1943. She detailed her experience with her and gave it as her opinion that Miss Ricker was of unsound mind. Mrs. Adele Mitchell, a nurse for 25 years, was relief nurse for Miss Ricker for a week or 10 days in September, 1944. Mrs. Mitchell said that from what she saw and observed (facts given) she was of the very definite opinion that Miss Ricker was of unsound mind. Mathias Mueller was employed at the Jefferson Hotel since 1912, as locksmith, door checker, carpenter, and cabinet maker. Every time he went to Miss Ricker's room Miss Johnson gave directions. When men folks came around Miss Ricker looked down, shy like. He said that about four years before Miss Ricker died Miss Johnson told him he should put a new panel in Miss Ricker's door and fix the lock so nobody could get in, except Miss Johnson, and so that if Miss Ricker locked the door from the inside she, Miss Johnson, could open it, and that he did that.

Edward Joyce was at the Jefferson Hotel from 1930 to January, 1944; was a houseman, timekeeper and was attached to the linen room. He testified: "I knew Miss Ricker (as Miss Rickert) and Miss Johnson; saw them practically every day. Miss Ricker wore old-fashioned, long black dresses, and high lace shoes; she never talked to nobody; I never held a conversation with her; I spoke to her when I would go in her room; I would do what she wanted me to do and get out. I moved her (when the hotel was under repair); her dresser, bed, and everything; she had about five trunks; there were a lot of hair combings in the dresser; she had them in a towel; she must have had a hundred of them—one roll after another. There were newspapers all along the wall all around; piles of them about 3½ feet high; some of them were back 10 years. You had to go to Miss

Johnson to get in Miss Ricker's room. I spoke to her as Miss Rickert; she never told me her name was not Rickert. She was always sitting in a rocking chair; when I would say 'Good morning', or 'Good evening', she would never answer me; just look at me; I would say she would just stare; she cut papers in long strips and the little bitty squares; she did that ever since I can remember. On one occasion I went to her room to get a chair to bring to the carpenter shop, and as I went to rap on the door I heard talking in the room; bawling somebody out, and when I got in there was nobody in there (except Miss Ricker); she had two chairs in the middle of the floor near the bay window.'' The witness gave it as his opinion that Miss Ricker was of unsound mind.

Appellants took the deposition of Margaret Custer Norton, respondent's wife, and respondent introduced parts of this deposition. In the deposition Mrs. Norton said that she visited the Ricker family at the Southern Hotel in 1907, and visited Miss Ricker at the Jefferson in 1934. Her evidence was to the following effect: In 1907 Miss Ricker did not join in any of the conversations. Mrs. Norton had said to Miss Ricker that her little daughter wanted a hair ribbon and that after that when she would come in Miss Ricker would ask her if she got the hair ribbon; such was all she said during the visit of 3 or 4 days, except yes and no. In 1934 Miss Ricker was about the same as in 1907. A drive by Herman Speaker, the chauffeur, was in prospect and rain was threatening. Miss Ricker would jump up and go to the window; Miss Johnson would say, ''Sit down, it's not going to rain; Herman will come''. Miss Ricker acted like a child. Miss Ricker, in 1934, had her hair arranged the same as in 1907. It was taken right straight back into a knot at the back; her dresses and shoes in 1934 were same style as in 1907—ankle length dresses and hightop lace shoes. In 1934 she wore a high crown hat with narrow brim. Mrs. Norton never saw Miss Ricker except in 1907 and 1934, and said that on both occasions she would say Miss Ricker was not a normal person.

Robert Ricker Norton, respondent, a railroad man, testified that the name Ricker in his name was for Colonel Ricker and that he had known the Ricker family all his life; he was born in 1875. He said that Jessie Grace, Miss Ricker's sister, was some younger than Miss Ricker (he called her Nellie); that in 1891 he lived for over a year in the home of the Rickers in St. Louis, 4408 Delmar; attended school; lived as one of the family. A close family relation, he said, existed between Mrs. Ricker and his mother, a sister of Mrs. Ricker's. There would be weeks go by that he did not see Nellie (Miss Ricker); she stayed almost entirely in her room. When Colonel Ricker was home she would come down for dinner; had no recollection of her ever initiating a conversation; did not recall her leaving the house except on one occasion shortly before the holidays in 1891. He was back in

St. Louis in 1902; the Rickers were then at the Southern. He visited again in 1907 (when Mrs. Norton was there); he mentioned the hair ribbon incident mentioned by Mrs. Norton. He did not see Miss Ricker again until 1914 when Mrs. Ricker died. The last time he saw Miss Ricker prior to her death was in 1933 or 1934. Mrs. Norton visited Miss Ricker in 1934, but they were not together. That was the first time he met Miss Johnson, but he had corresponded with her. In 1934, he said, Miss Ricker could remember some of her relatives; that so far as he knew she had no ill will as to her relatives. He said that Jessie Grace, after her marriage, lived in the East until the death of her husband; that he exchanged letters with Jessie Grace and that she visited him many times; that he wrote to Miss Ricker, but that she never wrote him a letter. On cross-examination he said that Miss Ricker was always subnormal and of unsound mind; that he was of that opinion in 1891 when he lived in the family. He said that she was under the domination, influence and control of Miss Johnson; that he got such impression when he went to St. Louis on the occasion of Miss Ricker's death.

Respondent introduced the death certificate of Miss Ricker, signed by Dr. Louis Hempelmann. The certificate recited that the immediate cause of death was "arteriosclerosis due to cerebral apoplexy". Also, respondent introduced the renouncement by Miss Ricker of her right to administer upon the estate of her sister Jessie Grace (appellant St. Louis Union Trust Company was the administrator).

Dr. Francis M. Barnes and Dr. Robert E. Britt were used by respondent as expert witnesses. Dr. Barnes was a graduate of Johns Hopkins University Medical School, 1907; when in medical school he spent his summer vacations in the State Hospital for the insane in New York. Following graduation he went for 3 years to the Sheppard & Pratt Hospital, a private institution for mental cases in Baltimore; taught nervous diseases at Johns Hopkins while at Sheppard & Pratt's. In 1910, went to Government Hospital for the insane at Washington; was there 3 years. Went to St. Louis in 1913, taught nervous diseases at St. Louis University and Washington University and was on the staff of various hospitals. Dr. Robert E. Britt had a comparable background to that of Dr. Barnes.

A hypothetical question covering the story of Miss Ricker about as above given was propounded to Dr. Barnes and Dr. Britt, and each gave it as his opinion that she was of unsound mind at the time of the execution of the will.

At the close of respondent's case in chief, appellants filed motion for a directed verdict in favor of the will; the motion was overruled, and appellants (proponents) proceeded with their case. Since the jury found against the alleged will, and since the principal question is whether respondent (contestant) made a submissible case, it will

not be necessary to deal at length with the evidence on appellant's side of the case.

Charles E. Ellison, Jr. was, at the time of the trial, assistant cashier of the Mercantile Commerce Bank & Trust Company; prior to that position he was for about 14 years a teller in the coupon department of the bank. He testified that he knew Miss Ricker; waited on her in the coupon department; accepted deposits of coupons. Miss Ricker, he said, would come up to the window "with her deposit ticket all made out and the envelopes and pass book and just hand it into the window", and that he would go through the formality of verifying. He did not know in whose handwriting the deposit tickets were, and he said that she came alone until about 1943. Asked if he would consider Miss Ricker of sound mind, said, "I would say she was of sound mind at that time".

Max L. Teich testified that he had been manager of the Jefferson Hotel since 1927; had known Miss Ricker and Miss Johnson over 20 years; gave his contacts with Miss Ricker. Asked if he had an opinion as to whether Miss Ricker was of sound or unsound mind, said, "I couldn't say that she was of unsound mind; she was just as natural as anyone". John Adamek was maintenance man at the Jefferson Hotel for 20 or 25 years, but left to work in a war plant in 1943; returned in July, 1945. Saw Miss Ricker on occasions; said her "mind seemed all right" to him. Mrs. Elizabeth Lettie and Barbara Lettie are the daughter and granddaughter of Mr. Teich. Their depositions were read. They frequently saw Miss Ricker about the hotel. Mrs. Lettie said, "She was surely as sound as anyone I ever came in contact with". Miss Barbara said that Miss Ricker "seemed of perfectly sound mind".

▮▮▮ Leslie G. Post, formerly with the St. Louis Union Trust Company as vice president in charge of the probate department, testified that he first met Miss Ricker in February, 1928, after the estate of Mrs. Small came into the trust company. Mr. Post said that on that occasion he suggested to Miss Ricker that she might give some consideration to diversification of her investments and that she was quick to inform him that these investments had been approved by her father and had passed on down; that the next thing he discussed with her was the matter of a will; that there had been no will left by her sister, and he understood, he said, that Miss Ricker was opposed to the public administrator administering on her sister's estate and that was the reason she came to the trust company to get it to administer on her sister's estate. In the will discussion Mr. Post said that Miss Ricker said, "Well, I know how I am going to leave my estate; I am interested in three charities. I have nothing but collateral heirs; I don't owe them anything; I don't propose to leave them anything", and Mr. Post said that Miss Ricker promised to follow up the matter of a will, but that at that time Miss Ricker said she didn't know what

proportion she wanted to leave her estate among these institutions, as she understood "those institutions would be exempt from these inheritance taxes". Mr. Post gave other experiences with Miss Ricker; had not seen her since 1928. On being asked if he had an opinion as to whether Miss Ricker was of sound mind, Mr. Post said, "I certainly never had any queston in my mind about her capability of transacting business".

Miss Ida Rufer, Festus, Missouri, a trained nurse, testified that she formerly lived in St. Louis; that in 1927 when Miss Ricker's sister died, Miss Johnson was in the hospital, and that she (Miss Rufer) was employed to go along with Miss Ricker to Portland, Maine, where the sister was buried; that "they felt it was wise for Miss Ricker not to go alone"; that she had not before known Miss Ricker. Miss Rufer on occasions thereafter saw Miss Ricker and from her contacts with her gave it as her opinion that "she was of very sound mind; even to the last she was just herself".

Miss Johnson testified: "I first met Miss Ricker December 6, 1909, at the Southern Hotel when I went there to take care of her mother who was 76 at that time; Grace Small was then gone away. I graduated as a nurse in 1901 at the Missouri Baptist Sanitarium. Miss Ricker spent her evenings in her mother's room. At that time Miss Ricker did her own shopping; went to the dressmaker; did her own banking; she talked quite a bit at that time; I did not often see her during the daytime. We left the Southern in 1912 when it closed; went to the Planters Hotel; Mrs. Ricker died in 1914. We remained at the Planters Hotel until it closed in 1922; then went to the Jefferson. I went to the burial of Mrs. Ricker in Portland. Miss Ricker (when Mrs. Ricker died) told me she wanted me to go to Maine with her and stay that summer and when she came back if she could afford it she wanted me to continue with her. After we returned Miss Ricker asked me if I was willing to stay with her, and I said, 'Yes, at the same salary'; she said, 'Would you be willing to take care of an old person?' I said, 'Of course, Miss Ricker, old people have to be taken care of'; she said, 'I think whoever does should be well rewarded'. My salary was $25.00 a week; Miss Ricker paid all my expenses. My duties were few; I was not nursing her; I got the mail; signed hotel meal checks which I had done for her mother, and when we traveled I took care of all that; we went to Maine every summer (in the early years). In nice weather we went to the Orpheum Theater every week; every spring we would go to Shaw's Garden, Miss Ricker read a great deal; got her own books at the Mercantile library; she went out alone. I always had dinner with Miss Ricker; we never had breakfast together at that time; she had her breakfast in the dining room at that time. Miss Ricker would give her order. She went shopping at Vandervoort's, sometimes alone. I almost never went to

Miss Ricker's room; I was in her room one time when we lived at the Southern, and at the Planters not more than a half dozen times.

 "At the Jefferson for the first many years I never went to her room, but when we traveled, right at the last of her packing I would go in and finish it up for her. If she wanted anything she would tell me; if I wanted house money I would tell her the night before and she would bring it to me. I was in her room in later years; some 10 years before her death she had a swollen ankle and a bad callous on her foot; I took care of these; the doctor advised putting in hot water; I kept this up for weeks and weeks on account of the callous and finally got it off; that is when I really started going to her room. I bought a car in 1928. Miss Ricker employed and paid the chauffeur and we shared the upkeep half and half. The first chauffeur was a Mr. Kuntz; he stayed until about December 1928, and Herman Speaker came to us December 7, 1928. We would go out highway 66 and to Crystal City very often and to Shaw's Garden, and Forrest Park. She would go out only in the spring and fall; she wouldn't go out in real hot or real cold weather. She always attended to her business without me until the very last; she would tell me the night before to have Herman (Herman Speaker) bring the car at a certain hour, 8:30 next morning. To pay for the car I sold some government bonds that I bought during the first World War. Miss Ricker did not go to sleep on drives except on coming back she would sometimes fall asleep. Ever since I knew Miss Ricker she was in the habit of taking a nap in the afternoon sitting up in a chair; she so told me; I didn't see her. Whatever clothes she bought were up to date and she wore very nice clothes; she preferred navy blue but she mostly wore black because she couldn't get what she wanted. I never heard her talk on the telephone because I was never in her room, but she told me about people calling her; sometimes she would tell me the tax man and the broker called.

"Miss Ricker contributed every year to the community fund, Red Cross, Salvation Army, Bible Society, Seamen's Church Institute, Humane Society. She also gave to the Symphony Society, U. S. O., and Crippled Children. She frequently talked about the Seamen's Church Institute; she received their monthly pamphlet for years; she didn't contribute to Shaw's Garden to my knowledge; she had a life membership in the Red Cross. When she first started having meals upstairs (about 1937 when the sore ankle came) she had all of them in her room; the doctor cautioned her not to walk too much; she did not go to the dining room after that; after her ankle got better she went to my room for meals; she would leave my room around 11 o'clock (evening); she would listen to the radio in my room. The last trip I recall her going out on business was in December, 1943; she attended to business after that; the tax man and the broker came to the hotel; the last year or two that Herman was with us I went

with her when she went to the bank—everywhere on business; she was afraid to walk after falling in her room (Miss Johnson had previously mentioned the incident of Miss Ricker falling.). We went to the First National, the Mercantile, Tegeler's office (broker), the tax man's office (Edgar W. Norton); I didn't go into the private offices with her. When she was making deposits at the bank, I would take her up to the window and stand back a little. When she would go to the bank to get in her safety deposit box she would give the man the key; he would get her box and carry it back for her; I didn't go in with her; she would sometimes take a newspaper with her and a string, and sometimes she would get so tired clipping coupons she would wrap them up and say they were bonds; I didn't see them, and take them to her room she said for the purpose of clipping them at her leisure. This was over a number of years. I think I made some deposits for her (after Miss Ricker fell in her room in January, 1944), I do not remember. She endorsed the checks deposited, except in late 1945, I endorsed one check that she overlooked and this was at the suggestion of the teller. After the January 1944 incident I slept in her room. She had been gradually growing stiff over several years. Until she fell she slept in the bed; after that she slept in the chair until the night, or night before, the nurses came (July 31, 1944). In June, 1944, Miss Ricker had a ▇▇▇ little bladder condition, an involuntary voiding of urine for a day or two; her ankles were so stiff she couldn't walk fast, so she couldn't get to the bathroom quick enough. I called Dr. Hempelmann; he had treated her sister (Mrs. Small); he came twice; he had waited on me through many years.

"In June or July, 1944, Miss Ricker wanted some information regarding a living trust and an agency; I went to the St. Louis Union Trust Company, talked to someone, but I couldn't explain it to her fully and she told me to call Mr. Frazier and tell him she wanted to make a will, and I called Mr. Frazier. That night, after dinner I said to Miss Ricker, 'I have made several wills, Miss Ricker, and when you are making a will it is hard to remember everything you want to put in; don't you think it would be a good idea if I get a pencil and paper and you told me what you wanted and I jotted it down?' She said, 'Yes'; I got the paper (hotel letterhead) and said, 'I am ready, Miss Ricker', and she started telling me. She gave me the names of all her cousins on her mother's side and told me to divide $25,000.00 between them; she said she had already taken care of Miss Nesmith. She said she wanted the residue to go to the Seamen's Church Institute, Shaw's Garden, and the Red Cross; she wanted the Seamen's Church to have the most; I said, 'How about dividing it, giving the Seamen's Church half, and dividing the other half between the two' (Shaw's Garden and the Red Cross), and she said, 'Yes, that is the way I would like it'. She wanted me and the St. Louis

Union Trust Company to be executors. She said that I might as well have half of it (commission). I made the suggestion that a stone be put to Mrs. Small's grave. I had met Mr. Norton (respondent) and his wife; I had never seen any of her cousins except Mr. Norton and Miss Nesmith; I didn't even know their names." Miss Johnson was shown the memorandum, and said that was the paper she filled out; that the names of the cousins therein and the addresses were given her by Miss Ricker. "She put in there if any of them contested the will they were not to get what she left them.

"Mr. Frazier came next day (after the preparation of the memorandum); talked to Miss Ricker about the living trust and agency first, and then she said, 'I want to make my will', and he explained they couldn't make her will and asked if she had a lawyer and she said she did not and asked him to get a lawyer. She gave the memorandum to Mr. Frazier; told him if any of them contested the will they were to be cut off without a dollar. After that Mr. Frazier and Mr. Berger came out; they brought out the form of a will and discussed the will; she told Mr. Berger about her scrapbook; Mr. Berger read over what he had written down; told her she would have to have witnesses and asked her if she knew anyone she wanted, and she said, 'Maybe Dr. Hempelmann would serve'. After they left she told me to see Dr. Hempelmann. I said, 'I will telephone Dr. Hempelmann'; she said, 'Don't phone him; go out and see him, because everything that goes through the operators here will go all through the hotel' (Mr. Frazier was called over the telephone). On July 6, 1944, Mr. Berger (with the final draft of the will), Mr. Frazier, and Dr. Hempelmann came. I had gone down to Miss Ricker's room (before the three came) to bring her to my room; was locking her door and Dr. Hempelmann turned the corner and walked, holding her arm, to my room with Miss Ricker, and sat there until the others came; we talked until they came; Dr. Hempelmann asked her the day of the week and the day of the month, and she answered, and when she said the day of the month, I said, 'I am glad you didn't ask me that because I didn't know'. Mr. Frazier and Mr. Berger came in about 10 minutes. Mr. Berger asked her about each of the items in the will and she answered. When he read about the relatives she changed her mind and decided she didn't want to give them anything. I said, 'Oh, Miss Ricker, don't do that; they will be disappointed'; she said, 'They have no right to be; you are not obliged to leave your relatives anything'; I said, 'Miss Ricker, they will be disappointed'; she said, 'How much do you think I ought to leave them?' I said, 'How about $10,000.00 apiece?' She said, 'I will not leave them $10,000.00 apiece; I don't want to leave them anything, but I won't leave then $10,000.00'. I said, 'Well, how about $5,000.00?' She said, 'Well, I will leave them that much, but I don't want to leave them anything'. She signed the will and the witnesses signed."

Miss Johnson went on to say that she told Miss Ricker that she (Miss Johnson) would not be responsible for the bonds in the room unless they were put in the safe deposit box; and testified about the authority given her by Miss Ricker to go to Miss Ricker's safe deposit box, and about her (Miss Johnson) getting the bonds out of Miss Ricker's room into the safety deposit box, and about Miss Ricker giving her government bonds in the sum of $77,000.00, payable to Miss Johnson at Miss Ricker's death. Miss Johnson said that Mrs. Cates and Miss Boston (nurses) were employed (July 31, and August 1, 1944) because Miss Ricker had gotten so stiff, she couldn't go to the bathroom and that she, Miss Johnson, couldn't alone take care of her. Miss Johnson said Miss Ricker signed all of her checks until February, 1946 (she died April 4, 1946). Many of these checks were in evidence. Miss Johnson said that Miss Ricker did not slobber and did not drool; that sometimes she would tear a little corner off the paper and drop it on the floor; that she cleaned her hair from the comb and would take it in her hand, wrap it back and forth, and it would fall into a figure 8; that she didn't do it to to make a figure 8; she would save them until she got quite a lot and then throw them out; that she had quite a few underclothes in her trunks that had turned yellow. Miss Johnson said that "Miss Ricker definitely was of sound mind".

Respondent had taken Miss Johnson's deposition, in which she testified that Miss Ricker had not given her anything of consequence, and on cross-examination at the trial she, in effect, admitted that Miss Ricker had, in 1940, given her $10,000.00 in government bonds, and $50,000.00 in 1944, and $17,000.00 in 1945, and explained that the bonds were purchased in her name and Miss Ricker's name (jointly as we understand) and that she did not regard them as hers until Miss Ricker's death. "I knew they were purchased in Miss Ricker's name and my name, to go to me at her death." Also, on cross-examination Miss Johnson denied that she had the conversation with Mrs. Cates (the nurse) about the will as related by Mrs. Cates.

Jerome F. Tegeler, in the investment business, met Miss Ricker in 1931 or 1932 at the Mercantile Commerce Bank, and said that from that day on "we started to do business together", various types of securities. Mr. Tegeler gave his contacts with Miss Ricker; said that she talked "normal conversations" about business; that when Miss Johnson came with Miss Ricker, she (Miss Johnson) remained in the reception room; that Miss Ricker ceased coming to his office the latter part of 1943. He gave it as his opinion that Miss Ricker was of very sound mind during his business transactions with her. Mrs. Nora Behren was a dress fitter at Vandervoort's; fitted Miss Ricker with dresses, she said, over a period of about 10 years; fitted her at the store twice a year, spring and fall, but went to the hotel in 1942, 1943, and 1945. Mrs. Behren said that Miss Ricker was alert and of

1244

sound mind. Mildred Young, a practical nurse, was nurse for Miss Ricker from April to August, 1945; gave her contacts with Miss Ricker and gave as her opinion that Miss Ricker was normal and of sound mind. Dr. William Kountz, a specialist in geriatrics, and with a background comparable to that of the experts who testified for respondent, on a hypothetical question, gave it as his opinion that Miss Ricker was of sound mind.

Herman Speaker, the chauffeur for Miss Ricker, was in the Navy after he left his employment with her and after the War was stationed at San Diego, California. Miss Johnson, before and after Miss Ricker's death, wrote some letters to Herman. In one of these (April 3, 1945) she said that Miss Ricker was "quite childish * * * she sits and cuts up the daily papers so she can get it in the waste basket, like a little girl with paper dolls". And in a letter (August 15, 1945) to Herman, Miss Johnson said, "Miss R. is so senile mentally—changed greatly in the past 5 months". In a letter to Herman of April 15, 1946 (Miss Ricker died April 4, 1946) Miss Johnson said, "A cousin (respondent) came on from Calif., but didn't go to me. He and Miss Nesmith have been nice about everything—I don't know if the fireworks will start now, not at me, tho'." In another (March 27, 1947) she said, "I guess hell's a poppin' here with the Ricker heirs, and I'm almost bursting to know what they asked you. I'm sure wondering if they will say she was incompetent and will try to make me the goat. I dare say I won't recognize myself after they pull their punches."

Herman Speaker testified that he received a letter from Miss Johnson in 1944, sometime after July; that his wife destroyed the letter; that in the letter Miss Johnson said, "Herman, I need you", and, "I have finally prevailed upon Miss Ricker to sign a will. She made me executrix of that will and that way I will get $85,000.00 which will not be subject to inheritance tax." Mrs. Speaker testified that she read this letter and that her daughter read it, and that it was about as given above. Miss Johnson denied writing such letter. Miss Johnson went to San Diego to see Herman, and he said that she asked him if he had kept the letters she had written to him; that he told her that "there were possibly some still around, I hadn't looked through all of my effects from the war, but I probably had some of them yet"; that Miss Johnson said, "If you find them destroy them or send them to me". Miss Johnson denied saying such. Herman Speaker, his wife, and Miss Johnson made a trip together from San Diego to Los Angeles. Mrs. Speaker testified that on this trip Miss Johnson "told me she would be willing to give $25,000.00 if this case never came to trial to keep Miss Ricker's name clear". Miss Johnson, as to this conversation, said that Mrs. Speaker said to her that she (Mrs. Speaker) had got half of her brother's insurance, and "I said, 'You mean his government insurance?'" She said, "Yes". I said, "Well, if Miss

Ricker's will is broken it will cost me $25,000.00, but if by giving up that $25,000.00 it would prevent the will being broken I would gladly give it up''.

At the close of the case appellants asked a directed verdict in favor of the will; this was denied; the first question therefore is, Did respondent make a submissible case on the question of testamentary incapacity? In ruling such question we disregard appellants' evidence except as it may aid respondent's case and accept respondent's evidence as true and give him the benefit of every inference legitimately to be drawn therefrom. Fowler et al. v. Fowler et al., 318 Mo. 1078, 2 S. W. (2d) 707, l. c. 709. See also Schoenhoff et al. v. Haering et al., 327 Mo. 837, 38 S. W. (2d) 1011, l. c. 1014; Pulitzer v. Chapman et al., 337 Mo. 298, 85 S. W. (2d) 400, l. c. 409; Whitacre et al. v. Kelly et al., 345 Mo. 489, 134 S. W. (2d) 121, l. c. 124; Walter et al. v. Alt et al., 348 Mo. 53, 152 S. W. (2d) 135, l. c. 142; Pickett et al. v. Cooper et al., 354 Mo. 910, 192 S. W. (2d) 412, l. c. 413.

In support of the proposition that respondent made a case for the jury on testamentary incapacity the following and other cases are cited: The Fowler case, supra; Hartman et al. v. Hartman et al., 314 Mo. 305, 284 S. W. 488; Post v. Bailey et al. (Mo. Sup.), 254 S. W. 71; Ray v. Walker et al., 293 Mo. 447, 240 S. W. 187; Byrne v. Fulkerson et al., 254 Mo. 97, 162 S. W. 171; Schieberl et al. v Schieberl et al., 261 Mo. 706, 170 S. W. 897; Norris et al. v. Bristow et al., 358 Mo. 1177, 219 S. W. (2d) 367. See also, Proffer et al. v. Proffer et al., 342 Mo. 184, 114 S. W. (2d) 1035.

A review of cases is, we think, unnecessary; these cases speak for themselves. A will contest is an action at law and a verdict can be directed only when the facts in evidence and the legitimate inferences therefrom are so strongly for or against the will as to leave no room for reasonable minds to differ. Townsend et al. v. Boatmen's National Bank et al., 340 Mo. 550, 104 S. W. (2d) 657, l. c. 665, and cases there cited. Though it extended this opinion to considerable length, much beyond the average, we set out in the main the evidence not only of respondent's case, ▮ but a substantial part of appellants' evidence. This was necessary, we think, in order to fully appreciate the whole picture and especially the part that Miss Johnson had in it. Appellants cite many cases in support of their contention that respondent failed to make a submissible case on testamentary incapacity. We have examined these cases, among which is Rex v. Masonic Home of Missouri, 341 Mo. 589, 108 S. W. (2d) 72. In the Proffer case we said that case on testamentary incapacity was stronger than in the Rex case, and so is the present case. Appellants say that Miss Ricker attended to her extensive business before and after the will. No letter or writing of any kind by Miss Ricker was in evidence, except her signature. If she could write anything except her name and was an able business woman, as appellants contend, it is indeed

strange that no writing, except her signature, over the years of her long life was available.

On the evidence adduced by respondent we rule that he made a submissible case on the issue of testamentary incapacity.

We now take up the subject of undue influence on the part of Miss Johnson. Respondent's instruction No. 3 submitted testamentary incapacity, and his instruction No. 5 hypothesized testamentary incapacity about as in No. 3, and then concluded, "*and* (italics ours) if you further find and believe from the evidence that the said Ellen A. Ricker, in such mental condition, if you so find, was subject to the dominion and control of the defendant, Mabel Johnson, if so, and that the said Mabel Johnson unduly exercised such dominion and control over the said Ellen A. Ricker, if so, in the disposition of her property, then in such circumstances, if you so find them, your verdict will be that said paper writing dated July 6, 1944, and offered in evidence as the will of the said Ellen A. Ricker, deceased, is not the will of the said Ellen A. Ricker, deceased".

For appellants the court gave instruction No. 10 which told the jury that the burden was on contestant to establish the facts hypothesized in the above quoted part of instruction No. 5, and for appellants the court also gave instruction No. 12, the usual cautionary instruction, defining undue influence, etc. Respondent says that the question of testamentary incapacity and undue influence, in so far as undue influence was submitted, were submitted in the *conjunctive* and that is true. We have ruled that respondent made a submissible case on testamentary incapacity and since undue influence, as submitted by respondent, was submitted in the conjunctive with testamentary incapacity it will not be necessary to rule the question of the sufficiency of the evidence to make a submissible case on undue influence. State ex rel. Pevely Dairy Co. v. Daues et al., 316 Mo. 418, 289 S. W. 835; Oesterle v. Kroger Grocery & Baking Co., 346 Mo. 321, 141 S. W. (2d) 780. We might say, however, that Miss Johnson appears in every picture reflected by this record and was on the scene on every occasion when Miss Ricker considered a will or any other arrangement about her property, and was in the picture when the purported will was executed, and when she was so concerned about the will when talking to Mrs. Herman Speaker on the trip from San Diego to Los Angeles, and when she wrote Herman Speaker that she had at last prevailed upon Miss Ricker to sign her will.

On the admission of evidence. Under this assignment appellants say that the court erred (1) in permitting lay witnesses to give their opinion that Miss Ricker was of unsound mind without sufficient foundation for such evidence; (2) in permitting respondent to read from the depositions of Mr. Berger and Mr. Frazier; (3) in admitting statements and declarations of Miss Johnson; (4) in permitting Mr. Berger, at the behest of respondent's counsel, to read the law in con-

nection with his cross-examination; (5) in admitting evidence concerning Miss Ricker long after the will was made; and (6) in permitting respondent's counsel to ask leading questions and questions calling for conclusions.

▇ A lay witness is not permitted to give an opinion that one is of unsound mind without first giving the facts upon which such opinion is based, and these [708] facts must be inconsistent with sanity in order to be a sufficient basis for such opinion. See Lee et al. v. Ullery et al., 346 Mo. 236, 140 S. W. (2d) 5, l. c. 10, and cases there cited. Much of the evidence of respondent's lay witnesses is set out above and speaks for itself. In the brief appellants mention witness Grover Scott and say that he testified "about her (Miss Ricker) sitting in a chair, tearing the papers, and shaking the table", and on this evidence appellants say the court permitted Scott to give his opinion that Miss Ricker was of unsound mind. Dealing with the subject of the qualifications of a lay witness to give an opinion that one is of unsound mind, the court in the Lee case, supra [140 S. W. (2d) l. c. 12], said that such witness must have had opportunity to observe and know the mental condition of such person. It will be noted from his evidence above set out that witness Scott went to Miss Ricker's room once a week, and sometimes more, from October 1943 until April 1946, and in all this time he never heard her "utter a single sentence". Surely he had the opportunity to observe and know the mental condition of Miss Ricker, and we hold that he was qualified to give his opinion that she was of unsound mind. And we rule that respondent's other lay witnesses were also qualified to so speak.

▇ On reading from the depositions. When respondent opened his case in chief, after appellants had finished with their prima facie case, he first sought to read for impeachment purposes certain portions of the depositions, theretofore taken, of Mr. Berger and Mr. Frazier. Objection was made and overruled that a proper foundation had not been laid to justify reading from the depositions. Respondent interrogated each of these witnesses on cross-examination about matters in the depositions, but did not cover everything that was read from the depositions. However, there was nothing of consequence read from the depositions that did not appear in the direct or cross-examination of these witnesses. As supporting the assignment on reading from the depositions appellants cite State v. Grant, 79 Mo. 113, l. c. 132; Van Verth v. Loose-Wiles Cracker & Candy Co., 155 Mo. App. 299, 136 S. W. 724; Warren v. Giudici (Mo. App.), 9 S. W. (2d) 541; State v. Bowen, 247 Mo. 584, 153 S. W. 1033. There is nothing in either of the cases cited that would support a ruling that reversible error was committed by reading from the depositions. We rule this assignment against appellants.

██ On statements of Miss Johnson. The statements of Miss Johnson admitted in evidence upon which complaint is made, pertain to the evidence of witnesses Priest, Herman Speaker, Mrs. Speaker, and Mrs. Cates. Priest testified, as appears supra, that Miss Johnson told him not to go to Miss Ricker's room with food without first coming to her; Herman Speaker testified that his employment as chauffeur for Miss Ricker came about in this way. He was sent to the Jefferson Hotel to see Miss Johnson by someone at the Federal Garage (where Miss Johnson's car was kept); that Miss Johnson "asked me all my life history and what I had been doing recently and if I was married", and then asked "if I was willing to work for $25.00 a week and I said I was"; that Miss Johnson then asked Miss Ricker (they were in Miss Ricker's room) "if she didn't think that was all right", and that she said, "Yes"; that he took both Miss Johnson and Miss Ricker out for a ride next day and was told that "my salary would be $30.00 a week"; that on the following day he took Miss Johnson down town without Miss Ricker and was told by Miss Johnson that "my salary would be $35.00 a week, because Miss Johnson said Miss Ricker thought I had a family and ought to be getting $35.00 a week". Appellants complain on what Miss Johnson said about the $35.00 a week. Also, Herman Speaker testified that a Mrs. Waters came to see Miss Ricker on occasions, and that Miss Johnson told him that sometimes Miss Ricker would not see Mrs. Waters because the visit had not been arranged. The evidence of Mrs. Speaker complained of was that Miss Johnson told her never to call Miss Ricker, and that Miss Johnson told Mrs. Speaker to take a package to an investment company and ██ "have it put in her account". Mrs. Cates testified that Miss Johnson told her that Miss Ricker never went to bed.

The point is that such statements, not in the presence of Miss Ricker, were not competent. Appellants rely on Schierbaum et al. v. Schemme et al., 157 Mo. 1, l. c. 17, 57 S. W. 526; and Teckenbrock v. McLaughlin et al., 209 Mo. 533, 108 S. W. 46. The facts in the cases relied on are not such as here. Miss Johnson did all the talking in the presence of Miss Ricker when Herman Speaker was employed and the inference is that the same was true next day when his salary was increased to $30.00 a week. And Speaker was paid the $35.00 a week salary by checks made out by Miss Johnson and signed by Miss Ricker, so what was said about the $35.00 salary out of the presence of Miss Ricker could not have been harmful. We do not appreciate how what Miss Johnson said to Herman Speaker about Miss Ricker not seeing Mrs. Waters could be of consequence. And we make the same observation as to the complained of evidence of Mrs. Speaker. And as to what Miss Johnson said to Mrs. Cates about Miss Ricker not going to bed, it appears later in Mrs. Cates' evidence that Miss Johnson said that Miss Ricker had been "in the chair day and night for sometime", which according to Miss Johnson was after Miss Ricker

fell in January, 1944, the implication being that such had not always been the case. Besides it might be inferred that whatever was said about Miss Ricker sleeping in a chair was in the presence of Miss Ricker. And as to the evidence of witness Priest complained of, it appears from the record that witness Priest always went first to Miss Johnson's room, and that then "Miss Johnson would go with me to 614", Miss Ricker's room. The way it was done would imply just what witness Priest said Miss Johnson told him, so no harm could have come to appellants from the evidence of Priest. Respondent says that Miss Johnson was the agent of Miss Ricker in practically every-thing concerning her and that what she said and did was competent, citing Gillespie v. Holland et al. (Mo. Sup.), 31 S. W. (2d) 774. Definitely Miss Johnson was the agent, the spokesman, the alter ego, so to speak, of Miss Ricker in practically all things as this record abundantly reflects. We do not think that appellants have reason to complain about any of these statements made by Miss Johnson.

On Mr. Berger reading the law. As appears, supra, Mr. Berger prepared the will and inserted in the witness paragraph the language, "we further certify at such time she was of sound and dis-posing mind and memory". On cross-examination counsel for re-spondent called Mr. Berger's attention to Sec. 520 of the statute and asked him to read it. Mr. Berger read the section (about wills) and thereupon counsel asked him to "turn to form 228", a form in Vol. 30 of the statutes for an attestation clause to a will which does not in-clude that the person making the will is of sound mind, etc. Appel-lants did not object to Mr. Berger reading Sec. 520, but objected to the reading of the attestation form. The objection was overruled and Mr. Berger read form 228. Counsel then handed to Mr. Berger Vol. 24, Missouri Reports, and directed his attention to the case of Murphy v. Murphy, p. 526, and to the paragraph of the opinion where it is said that "there is nothing in the idea that it should appear from the attestation of a witness to a will, that the testator was of sound and disposing mind". Objection was made to reading from the report, and it does not appear that Mr. Berger read aloud from the report, but counsel asked him to "look at the middle paragraph" and "state what the court there said with reference to attestation clauses". Mr. Berger did not answer as to what the report said, but stated that a witness to a will was not required to state in the attestation that the testator was of sound mind.

Cross-examination has and should have reasonable latitude. Mr. Berger was a lawyer; he drew the will; was a witness to its execution, and at the trial testified that Miss Ricker was of sound mind. In other words he was in the nature of an expert witness. See Cooper v. Atchison, Topeka & Santa Fe R. Co., 347 Mo. 555, 148 S. W. (2d) 773. Also, we might say that Mr. Berger took care of himself quite well, and it is remotely unlikely that appellants were in the

least harmed by the cross-examination of Mr. Berger. As to the complaint on leading questions, and on questions calling for conclusions, and on evidence as to Miss Ricker after the will was executed, it is sufficient to say that we have examined these assignments and do not believe that there is substantial merit in them.

■ Under the exclusion of evidence assignment appellants say that the court erred (1) in not permitting, on the cross-examination of Dr. Barnes and Dr. Britt, respondent's expert witnesses, to ask about the qualifications and reputation of Dr. Hempelmann, a witness to the will and deceased at the time of the trial; (2) in not permitting Dr. Kountz, appellants' expert witness, to give his opinion that Miss Ricker's signature on the will "does not show the effect of arteriosclerosis and in not permitting the doctor to testify that there was nothing unusual about her signature for a lady of her age".

Dr. Hempelmann was not a witness at the trial; he was a witness, however, to the will and made an affidavit to the effect that Miss Ricker was of sound mind when the will was executed and this affidavit was used in the probate of the will and is in evidence here. There was just no place for any evidence as to the qualifications or reputation of Dr. Hempelmann. Dean v. Wabash R. Co., 229 Mo. 425, 129 S. W. 953; Black v. Epstein et al., 221 Mo. 286, 120 S. W. 754; Thomas et al. v. Thomas et al. (Mo. Sup.), 186 S. W. 993.

■ As will be noted, supra, Miss Ricker's death certificate recited that the immediate cause of death was "arteriosclerosis due to cerebral apoplexy", and on redirect examination of Dr. Kountz appellants sought to show that Miss Ricker's signature on the will did not show the effect of arteriosclerosis. The objection made was that such called for a conclusion, invaded the province of the jury; was not medical. The court remarked, "That is a question of handwriting; objection sustained". Appellants then made the offering which was excluded. Then appellants asked Dr. Kountz, "Is there anything unusual about that signature for a lady of 85 years of age"? Same objection was made and sustained. Since this evidence was sought on redirect examination and had not been touched upon in direct examination, the matter was largely within the discretion of the court. Johnson v. Minihan et al., 355 Mo. 1208, 200 S. W. (2d) 334. Besides the evidence sought could not have been of much consequence.

■ On the refusal of withdrawal instructions. Appellants submitted and were refused instructions withdrawing from the jury the issues of testamentary incapacity, undue influence on the part of Miss Johnson, and what appellants term the alleged issue of fraud in the procurement of the will. Testamentary incapacity, as we have ruled, was an issue for the jury, and no question of fraud in the procurement of the will was submitted to the jury. As appears, supra, respondent submitted in the conjunctive with testamentary incapacity

the question of dominion over and control of Miss Ricker by Miss Johnson. Besides all this, it is not error, ordinarily, to refuse withdrawal instructions. Perryman v. Mo. Pac. R. Co., 326 Mo. 176, 31 S. W. (2d) 4; Reith v. Tober, 320 Mo. 725, 8 S. W. (2d) 607; Siberell v. St. Louis-San Francisco Ry. Co., 320 Mo. 916, 9 S. W. (2d) 912; August Viermann Bricklaying Co. v. St. Louis Contracting Co., 335 Mo. 534, 73 S. W. (2d) 734.

Appellants say they were prejudiced (1) by the argument that they had the nurses' bedside notes made in the course of nursing Miss Ricker, but failed to offer these notes in evidence; (2) by remarks of Mr. Rogers (counsel for respondent) in his opening statement to the effect that he was on the trail of or was looking for another $100,000.00 of bonds belonging to Miss Ricker; and (3) by complimentary remarks about the trial judge made by Mr. Rogers in the closing argument.

Mr. Allen, counsel for appellants, in argument had said something about the nurses not liking Miss Johnson, and wanted to testify against her. Mr. Cox, counsel for respondent, in his argument, referred to this argument of Mr. Allen, and then said, ''Ladies and gentlemen, there is a silent witness in connection with this nursing that you were entitled to see. You (a juror) are the wife of a doctor. All of us probably at some time have gone to the hospital to see loved ones and one of the things we like to do is to get hold of the hospital record and see the bedside notes''. Objection was made on the ground that these notes were equally available to both sides and that respondent's counsel did not ask for the notes. Thereupon Mr. Cox said, ''She (Miss Johnson) testified from the witness stand she turned them (the notes) over to her counsel''. The court said, ''You may proceed''. Appellants cite Secs. 86 and 89, Laws 1943, pp. 379, 381, Mo. RSA, Secs. 847.86, 847.89; Belding v. St. Louis Public Service Co., 358 Mo. 491, 215 S. W. (2d) 506, l. c. 514. The code sections cited deal with the subject of the production of documents and answering interrogatories. The situation here as to the argument is not such as that in the Belding case. In that case the availability of witnesses was the point, and there was no showing that these witnesses were under the control of the defendant. Here it is conceded that these notes were in the possession of counsel for appellants. See also Harrison v. St. Louis-San Francisco Ry. Co., 339 Mo. 821, 99 S. W. (2d) 841, l. c. 845; Huskey v. Metropolitan Life Ins. Co. (Mo. App.), 94 S. W. (2d) 1075.

Respondent had taken Miss Johnson's deposition in which she had denied receiving any gift of consequence from Miss Ricker, and in his opening statement Mr. Rogers said it was thereafter discovered that Miss Johnson had been given $67,000.00 in bonds, ''and we are on the search of another $100,000.00 somewhere''. Appellants Seamen's Church Institute, the Red Cross, and Shaw's Garden moved

for a mistrial; appellant executors did not join in the motion which was overruled. In his closing argument Mr. Rogers got back to this subject, and, after some colloquy between Mr. Rogers, Mr. Allen and the court, Mr. Rogers withdrew the statement and said, "This is what I will say", and then went on without further objection. We do not think that any harm came to appellants respecting the opening statement or argument as to being on the trail of another $100,000.00 in bonds. And there is no merit in the contention that appellants were harmed by the complimentary remarks about the trial judge.

We have carefully examined all the assignments made by appellants; there is no substantial merit in any of them. Hence it follows that the judgment should be affirmed and it is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.